HANSEN, ET AL., APPELLANTS, v. GALIGER, ET AL., RESPONDENTS.

No. 8895

Submitted May 20, 1949. Decided July 13, 1949.

208 Pac. (2d) 1049

Mr. Ralph J. Anderson, and Mr. Albert C. Angstman, both of Helena, for appellants. Mr. Angstman argued orally.

Mr. Lyman H. Bennett, Jr., Virginia City, for respondents. Mr. Bennett argued orally.

MR. CHIEF JUSTICE ADAIR:

Appeal from order refusing to grant injunction pendente lite in an action captioned "L. W. Hansen, G. Dewey Allhands and Kathryn Pankey, Plaintiffs vs. Mike Galiger and Charlie Mike Galiger, Defendants," filed September 4, 1948, in the district court of Madison county, Montana, on which date an order to show cause on a day certain issued.

The complaint avers: That "defendant Mike Galiger is the owner of certain lands * * * in Madison county, Montana, particularly described as * * * SW¼NW¼, W½SW¼ of Section 33, Township 5 S., Range 4 W. of the Montana Meridian, sub-

ject, however, to the easement and ditch right * * * of plaintiffs in the * * * McFadden ditch, which * * * runs in a general northerly-southerly direction upon and across the * * * described lands of the defendant Mike Galiger'' (par. III) ; that plaintiffs are the owners ''of certain agricultural lands in Madison County, Montana, and certain water rights out of Alder Gulch Creek and appurtenant to said lands'' (par. I) ; that plaintiffs are the owners of ''and entitled to the possession of, an easement and ditch right in a ditch known as McFadden Ditch, which * * * carries the water rights aforesaid from Alder Gulch Creek to the lands of the plaintiffs'' (par. II) ; that ''defendants are now, and for approximately three years heretofore have been, interfering with the proper enjoyment of the plaintiffs in their said ditch rights through the lands of the defendant Mike Galiger in that * * * defendants have during said period, and do now, refuse to allow the plaintiffs to take machinery and equipment along the banks of said ditch for the purpose of cleaning the same, and that on or about the 19th day of August, 1948, the defendant Charlie Mike Galiger did by force of arms refuse to allow plaintiffs to drive a vehicle along the banks of said ditch for the purpose of repairing said ditch'' (par. IV) ; that ''said ditch is clogged with vegetation and silt and is in such condition that it must be cleaned out this fall, prior to freezing, so that next spring it will be in condition to carry water with which to irrigate the lands of the plaintiffs;'' that plaintiffs ''are desirous of cleaning said ditch with a dragline shovel to be operated along the banks of said ditch, but that defendants refuse * * * to allow the same and assert that plaintiffs must clean said ditch by hand, which procedure would be wholly impracticable and impossible'' (par. V) ; that defendants' ''assertions, threats, claims and refusals * * * are wrongful and unlawful;'' that ''plaintiffs have the right to go upon the said lands of the defendant Mike Galiger without interference and to use so much of said lands on either side of said ditch as may be required to make repairs and to clear out said ditch and to use vehicles and machinery for said purposes'' (par. VI) ; and that ''the obstructions and inter-

ference as aforesaid by the defendants with the proper enjoyment by the plaintiffs of this easement in McFadden Ditch through the lands of the defendant Mike Galiger is and has been continuous and causes irreparable injury to the plaintiffs'' (par. VII).

The complaint contains no description of the lands of the respective plaintiffs nor averments as to the amount or extent of their respective claimed water rights, nor as to the extent of their claimed easements, nor as to the location thereof except the allegation that the defendant Mike Galiger owns the lands described in paragraph III, supra, ''subject, however, to the easement and ditch right * * * of the plaintiffs in the said McFadden Ditch, which * * * runs in a general northerly-southerly direction upon and across the said described lands of the defendant Mike Galiger.''

Again the complaint contains no averments that defendants threaten or that they intend in the future to interfere with plaintiffs' claimed rights, or that they intend to occasion plaintiffs any irreparable injury other than the above quoted bald legal conclusions that ''the obstructions and interferences as aforesaid by the defendants * * * causes irreparable injury to the plaintiffs'' (par. VII). See: Poorman v. Mills, 35 Cal. 118, 95 Am. Dec. 90; Allen Clark Co. v. Frankovich, 42 Nev. 321, 176 Pac. 259; Giesy v. Aurora State Bank, 122 Or. 1, 255 Pac. 467, rehearing denied 122 Or. 1, 256 Pac. 763; 4 Bancroft's Code Pleading, sec. 1960, p. 3351; Crenshaw v. Crenshaw, 120 Mont. 100, 182 Pac. (2d) 477, 486; Emery v. Emery, 122 Mont. 201, 200 Pac. (2d) 251, 260.

Defendant Charlie Mike Galiger, by his guardian ad litem and defendant Mike Galiger, personally, interposed a motion to quash the order to show cause on the grounds that the complaint fails to state facts sufficient to constitute a cause of action against either defendant or to warrant the issuance of an order to show cause why an injunction pendente lite should not issue or to warrant the issuance of an injunction.

On September 28, 1948, the defendants' motion to quash was

overruled pro forma,—a hearing was had on the show cause order whereat evidence was introduced and additional time allowed for the filing of briefs.

On December 31, 1948, briefs having been submitted, the court made an order denying plaintiffs' application for an injunction and extended plaintiffs' time for serving and filing a bill of exceptions.

. February 11, 1949, notice of appeal was served and, on March 5, 1949, transcript on appeal was filed.

March 16, 1949, defendants filed, in this court, a motion for an order requiring plaintiff's attorneys to produce and prove their authority to appear for and represent the plaintiffs on this appeal and particularly to appear for and prosecute the appeal as to Kathryn Pankey, and for dismissal of the appeal should plaintiffs fail to produce such authority. An affidavit by Kathryn Pankey, filed in support of defendants' motion, states that she was never consulted concerning the commencement of this action in the district court and that she knew nothing about it prior to about March 6, 1949, when she read a news item appearing in The Montana Standard, a newspaper published in Butte, Montana, stating that an appeal had been taken to this court in such action.

It is the contention of defendants, first, that on the facts shown by the Pankey affidavit the entire appeal should be dismissed, the second, that in any event, the appeal should be dismissed as to Kathryn Pankey.

Plaintiffs' counsel state that they had assumed the plaintiffs Hansen and Allhands had authority to represent Kathryn Pankey but that from the latter's affidavit they find they were in error in such assumption, and say in their brief: "But, that does not warrant the dismissal of the appeal. The appeal should be dismissed as to her." We agree that insofar as the appeal relates to Kathryn Pankey that it should be dismissed, and it is so ordered. See Union Bank & Trust Co. v. Penwell, 99 Mont. 255, 42 Pac. (2d) 457.

At the hearing the plaintiffs Hansen and Allhands introduced

in evidence a decree in a water right suit entered January 29, 1924, in the district court of Madison county, being cause numbered 1772 therein. Such decree adjudges that Kate Pankey is the owner and entitled to the proper use of 40 inches, one cubic foot per second flow of the waters of Alder Gulch Creek diverted and appropriated June 1, 1865, through and by means of what is designated as the ''McFadden-Johnson-Nason Ditch'' and that she, Kate Pankey, is also the owner and entitled to the proper use of 35 inches, 7/8 of one cubic foot per second flow of the waters of Alder Gulch Creek, diverted and appropriated June 1, 1880, through and by means of what is designated as the Mc-Fadden Ditch.'' The decree also adjudges that M. Johnson is the owner and entitled to the proper use of 35 inches, 7/8 of one cubic foot per second flow of the waters of Alder Gulch Creek diverted and appropriated June 1, 1865, through and by means of that certain ditch designated as the ''McFadden-Johnson-Nason Ditch'' and that he is also the owner and entitled to the proper use of 15 inches, 3/8 of one cubic foot per second flow of the waters of said Alder Gulch Creek diverted and appropriated June 1, 1919, through an unspecified ditch taken out of said Alder Gulch Creek by him.

At the hearing the plaintiffs Hansen and Allhands also introduced in evidence a later decree in a water right suit entered July 3, 1947, in said district court in cause numbered 3089 therein. Such decree, after referring to certain water rights appropriated from the Ruby River through the ''Dupuis Ditch'' adjudges: That G. Dewey Allhands and his predecessors in interest by means of the ''Stoltz-McFadden Ditch'' tapping the right bank of Alder Creek, diverted and appropriated therefrom 35 miner's inches as of June 1, 1865, and 15 miner's inches of water as of June 1, 1919, and that Kathryn Pankey and Rose C. McFadden, by and through their predecessors in interest, by means of the ''McFadden Ditch'' and the ''McFadden-Johnson-Nason Ditch'' which taps Alder Creek, diverted and appropriated therefrom as of June 1, 1865, 40 miner's inches and as of June 1, 1880, 35 miner's inches of the waters of said creek.

*Allhands' Rights.* Plaintiff Allhands is the successor in interest of the two water rights originally decreed to M. Johnson of 35 inches and 15 inches, respectively, making a total of 50 inches in all.

In 1927 Johnson conveyed his land to Stoltz "Together with an equal undivided one-tenth interest in and to that certain ditch, water and water-right known as the Company Ditch; and also all other ditches, water and water right belonging to and used in connection with said lands * * *.'' Stoltz died and, by decree of distribution made and filed August 28, 1936, his real property was distributed to his widow Florence Stoltz, including the water rights belonging to and used in connection with said lands as described in the deed to Stoltz.

In 1938 the widow, Florence Stoltz, conveyed the Stoltz land to G. Dewey Allhands describing therein the water rights as in the deed to Stoltz and as in the decree to Mrs. Stoltz.

Plaintiff Hansen testified that the "McFadden Ditch," the "Nason Ditch" and the "McFadden-Johnson-Nason Ditch" are "one and the same ditch."

*Galiger's Rights.* Defendant Mike Galiger's lands were patented to his predecessor, William I. Dehortz, on July 12, 1889.

In 1910 the Ellings Estates Company, a successor in interest of Dehortz conveyed the Dehortz land to James Harkins and, after describing the land in such deed of conveyance, set forth the following reservations, viz.: "save any and all road and ditch rights of way subsisting across said lands and particularly the right of way for that certain ditch owned by M. Johnson across said land, being 10 feet in width on each side from the middle or center of said ditch, said ditch being known as the 'Nason Ditch,' all of which rights of way are reserved by this instrument."

The Ellings Estates Company is not a party to this action and there is nothing in the record to show that the Ellings Estates Company ever conveyed to either Hansen or Allhands or to their predecessors the right of way for road and ditch so reserved by such company in its deed of 1910 to Harkins. The deed of the executor of the estate of James Harkins to Charles T. Bock does

not describe or make any reservation of any such right of way for road or ditch, nor does the deed from Charles T. Bock to Mike Galiger and wife describe or make any reservation for any such right of way.

As shown above in the deed from M. Johnson to Stoltz and in the deed from Stoltz to G. Dewey Allhands, no such right of way as described in the deed from the Ellings Estates Company to Harkins was included, such deeds merely transferring a one-tenth interest in the "Company Ditch" and "also all other ditches * * * belonging to said lands," being a conveyance only of the ditch easements across such land as they existed at and before the patent of July 12, 1889, to Dehortz of what is now Galiger's land, and there is no evidence that anyone ever acquired any other easement for a ditch across the Galiger land after patent issued therefor.

The one ditch variously known as the McFadden ditch, the Nason ditch and the McFadden-Johnson-Nason ditch carried all water appropriated by plaintiffs' predecessors before 1889, namely the 40 inches and the 35 inches appropriated June 1, 1865, and June 1, 1880, respectively by Kathryn Pankey's predecessors, and the 35 inches appropriated June 1, 1865, by M. Johnson's predecessors.

The other 15 inches, diverted through the same ditch, was not appropriated by M. Johnson's predecessors until June 1, 1919, and it is only the M. Johnson rights and ditches that were later acquired by the plaintiff G. Dewey Allhands.

The ditch extends through the Galiger land for a distance of about one-half mile and served only to conduct the 75 inches of water of Pankey and the 50 inches of Allhands making a total of 125 inches of water.

Plaintiff Hansen testified: "I haven't any water rights. * * * I don't own any right. I use water owned by McFadden and Allhands."

On May 14, 1943, G. Dewey Allhands and wife executed a deed reciting that in consideration of $75.00 they "grant to L. W. Hansen, a sufficient interest in that certain ditch known as

the McFadden Ditch, which ditch leads from the vicinity of the boundary of the Chris Hansen and Tilton Ranches near Ruby, Montana and leads to and across my ranch known as the McFadden Ranch, it being understood that this conveyance affects only such portion of said ditch as the same crosses said McFadden Ranch, the interest conveyed hereby being a sufficient interest in said ditch so that said L. W. Hansen may conduct through and by means of said portion of said ditch not to exceed one hundred (100) statutory inches of water to be produced'' by means of said ditch. As to this deal Allhands testified he claimed and claims only 50 inches of the water of Alder Creek, as decreed to him; that he only gave Hansen a right in the ditch and after executing the attempted transfer to Hansen he [Allhands] continued to use the ditch to just as great an extent as he had theretofore used it. Allhands admitted that he had heard Hansen testify that the water Hansen was using was Allhands' water and Allhands further testified that he did not use water through this ditch to exceed ten or fifteen days each year.

Thus does it appear: That Kathryn Pankey did not authorize either the commencement or prosecution of this action; that plaintiff Hansen has no right whatever in or to the water transmitted through the McFadden ditch and that Allhands, who never had or claimed but 50 inches of water, nevertheless assumed to authorize Hansen to use 100 inches of water through the McFadden ditch across Galiger's land. Of course, Allhands may not both eat his cake and have it too. He may not retain and use his entire 50 inches of water and in addition transfer to Hansen the right to use 100 inches of water which he never possessed.

Hansen testified the ditch starts at the upper end of Tilton's field; that it runs thence through Tilton's field into and across Galiger's field; that it touches a corner of Allhands' field; and thence runs across McFadden's field into Hansen's field; that there are cottonwood trees growing along the banks of the ditch through Galiger's field; that he did not recall that he had ever seen anyone clean or attempt to clean the ditch by hand and that

Galiger has never refused to allow him to clean the ditch by hand or with horse and scraper.

The drag line outfit which Hansen and Allhands propose using to clean the ditch was described by Hansen as being 8 feet wide outside of the tracks with a bucket about 28 inches wide. He testified that it would take probably six weeks for one man to clean that ditch by hand with a shovel; that he did not know how much it would cost, but, "Roughly, three hundred sixty dollars plus board." As to the cost of cleaning the ditch with a drag line outfit Hansen testified: "I do not believe there would be much difference in the cost. It would be a better job with a shovel." Apparently when considered in the light of what was said by other witnesses, this testimony refers to the estimated cost of cleaning the entire ditch from its source down through the lands of all the other land owners to Hansen's field.

Allhands testified that when he first became acquainted with the ditch, some ten years before the hearing, that it was then five feet wide at top, three feet wide on the bottom and two or three feet deep; that it had not been cleaned since the time when he assumed to transfer a right or interest therein to Hansen and that the last cleaning occurred some seven years before the date of the hearing at which time he and Mike Galiger cleaned it through the Galiger field in seven days using hand shovels and assisted by three other men.

Mike Galiger testified: The last time the ditch was cleaned through his lands was seven years before the date of the hearing, at which time with one horse, a one-horse scraper and three men working in the ditch that portion thereof running through his land was cleaned; that the remainder of the ditch was cleaned by hand work; that he had helped clean the ditch every second year until Hansen asserted and claimed an interest therein and that with a horse and scraper the ditch could be and was cleaned across his land in six or seven days.

Arthur Gratton, a witness for defendants, testified: That he had known the McFadden ditch for thirty-five years; that he knew that the means employed to clean it, from time to time, was

with a shovel and a horse scraper; that in the spring of 1944 he had assisted in cleaning the ditch at which time it was given a good, thorough cleaning requiring about 10 days to complete the job, apparently referring to the cleaning of the entire ditch. John Gratton, a witness for defendants, testified: That he had known the McFadden ditch for years, that in 1919 he had helped clean it; that he and one other man cleaned it through Mike Galiger's land; that in cleaning the ditch through the Tilton ranch a horse and scraper were used; that the ditch was then given a good, thorough cleaning, enabling it to carry the water placed in it and that to the best of his recollection it required possibly two weeks for two of them to do the work.

Defendant Mike Galiger testified: That he has a ditch paralleling the McFadden ditch at a distance of eight feet at some places and closer and a little more distant at others; that the effect of using a drag line outfit to clean the McFadden ditch would be to fill up the much smaller parallel Galiger ditch which is but about one and one-half feet wide; that willows overhang the McFadden ditch and that there are cottonwood trees as large as a man's leg growing on either side of the ditch; that to use a drag line outfit in cleaning the ditch would require the cutting of the willows and cottonwood trees with an ax and that he had made inquiry of one Blossig, the owner of the drag line outfit, who informed him that the drag line outfit would require a right of way of "not less than thirty feet."

Hansen admits there are cottonwood trees and willows along the banks of the ditch and that they would be in the way of a drag line outfit if used.

The undisputed evidence shows that the McFadden ditch so long used to conduct the appropriations of 1865 and 1880 had always been cleaned out by hand shovels or by horse and scraper and that it could be and was efficiently cleaned by such means. Thus there is substantial evidence tending to show that no irreparable injury would result to plaintiffs if they were not allowed to do that which never as yet has been done, namely, to

use a drag line outfit for cleaning the ditch across Galiger's land.

Thus there is evidence tending to show that a drag line outfit would damage Galiger's land for a distance of from not less than 8 to 30 feet on either side of the half mile of ditch; that such operation would damage and fill Galiger's separate ditch running in close proximity and parallel thereto; that the drag line outfit would destroy the willows and cottonwood trees along the banks and that it would considerably widen and enlarge the McFadden ditch over and above its required and actual size prior to the issuance of patent in 1889 for the Galiger land.

Prior to the issuance of such patent the Galiger land was public domain through which the so-called McFadden ditch was constructed to carry and conduct the appropriations made in 1865 and 1880, which, plus the appropriation of 15 inches made in 1919, aggregate 125 inches and no more. The ditch, 5 feet wide at top, 3 feet on bottom and 2 to 3 feet deep had been found sufficient to carry all these appropriations prior to 1945 at which time Allhands assumed to give Hansen a right to conduct therein an additional 100 inches of unappropriated water.

It is well settled that ditches constructed and used on public domain constitute a grant or easement for the ditch so constructed and used and that a patentee to which the land is subsequently granted takes subject to such easement. However, it is equally well settled that such ditch cannot be enlarged or materially changed by its owners without the consent of the patentee and his successors after the land on which the ditch was so constructed has been granted to another by patent from the government. Snyder v. Colorado Gold Dredging Co., 8 Cir., 181 F. 62; Felsenthal v. Warring, 40 Cal. App. 119, 180 Pac. 67; White Bros. & Crum Co. v. Watson, 64 Wash. 666, 117 Pac. 497, 44 L. R. A., N. S., 254; Prentice v. McKay, 38 Mont. 114, 98 Pac. 1081; 2 Kinney on Irrigation and Water Rights, secs. 781, 990, 991. See Also: Clausen v. Armington, 123 Mont. 1, 212 Pac. (2d) 440.

The evidence tends to establish a reasonable inference that

after Hansen had obtained permission from Allhands to use the ditch for conducting 100 inches of water which Allhands did not and does not own, that Hansen then sought to enlarge the ditch by the use of the drag line outfit rather than proceeding with the cleaning of the ditch by employing the simple and efficient method that has proven eminently successful for over fifty years.

It must also be remembered that the hearing at which the evidence now before us was presented was a hearing on an order to show cause why an injunction pendente lite should not issue wherein the injunctive order was not sought merely to preserve the status quo of the ditch until a trial could be had on the merits, after issue joined, for the allegations of the fifth paragraph of the complaint, filed September 4, 1948, clearly show that plaintiffs Hansen and Allhands intended to immediately proceed with the cleaning of the ditch with a drag line outfit that fall prior to freezing without regard to the damage that would result to defendants' land and to their adjacent ditch from such proposed operations.

In Atkinson v. Roosevelt County, 66 Mont. 411, 214 Pac. 74, 77, the court quoted the following with approval from High on Injunctions, 2d Ed., sec. 4: "The sole object of an interlocutory injunction is to preserve the subject in controversy in its then condition, and without determining any question of right, merely to prevent the further perpetration of wrong, or the doing of any act whereby the right in controversy may be materially injured or endangered." The court in the above case also said: "It is a well-settled rule in this state that the allowance of a temporary injunction is vested largely in the sound legal discretion of the district court, with the exercise of which this court will not interfere except in instances of manifest abuse."

In High on Injunctions, 4th Ed., sec. 5a, the rule is stated as follows: "Since the object of a preliminary injunction is to preserve the status quo, the court will not grant such an order where its effect would be to change the status. Thus, when the plaintiff seeks to enjoin the defendant from interfering with acts about to be done by the plaintiff against objection of the de-

fendant, a preliminary injunction restraining such interference is erroneous since its effect is to destroy the existing condition of the subject-matter of the suit by permitting the doing of affirmative acts by plaintiff in advance of the final determination of his right to do them.''

In the light of the evidence presented at the hearing on the order to show cause and the authorities above cited, we cannot say the district court abused its discretion in denying plaintiff's application for a preliminary injunction. Accordingly the order refusing to grant an injunction pendente lite is affirmed.

Associate Justices Freebourn, Metcalf and Bottomly, concur.

MR. JUSTICE ANGSTMAN (concurring in part and dissenting in part).

I concur in what is said in the foregoing opinion on the subject of the dismissal of the appeal as to Kathryn Pankey. I disagree with the holding of my associates that the injunction pendente lite was properly denied.

The only issue before the court was whether plaintiffs under the facts presented could employ modern methods of cleaning the ditch in question or whether they must do it by hand or with horses as in former years. Plaintiffs desired to make use of a drag line for that purpose.

Defendant Mike Galiger testified: ''They can go in any time they wanted to and clean it. Clean the ditch by horse or by hand any time they can do it.''

The case did not involve the extent of the water rights of the respective parties.

Defendant Mike Galiger's testimony that his ditch paralleling the one in question here would be filled by use of the drag line rests entirely upon speculation. According to plaintiffs' evidence there would be no interference with his paralleling ditch. The injunction order which I think should have issued could have guarded against such contingency. It should have expressly provided that plaintiffs may use the drag line only in the event that it may be used without interfering with defendants' paralleling

ditch. There was also some testimony as to cottonwood trees. If it was thought proper and necessary that the life of the trees be spared the injunction order could likewise have so provided. That we can still cling to the horse and buggy days has been denied by those in high authority. I think one owning an easement for ditch rights, as do the plaintiffs here, has the right to employ modern methods and means of cleaning the ditch. Compare Matteodo v. Capaldi, 48 R. I. 312, 138 A. 38, 53 A. L. R. 550; and Laden v. Atkeson, 112 Mont. 302, 116 Pac. (2d) 881, particularly where it may be done without injury to another.

And the complaint charging as it does that defendants' acts of interference with plaintiffs' rights have been and are continuous, I think is sufficient to state a cause of action for injunctive relief for the rule is that "Repetition of the trespass, necessitating a multiplicity of actions, in itself may render the legal remedy inadequate." Union Central Life Ins. Co. v. Audet, 94 Mont. 79, 21 Pac. (2d) 53, 56, 92 A. L. R. 571. And, "As the case is one to restrain continuous trespass and avoid a multiplicity of suits, it is not material whether the defendant is or is not insolvent." Thrasher v. Hodge, 86 Mont. 218, 283 Pac. 219, 222. The complaint in my opinion is sufficient to state a cause of action for injunctive relief and the evidence without conflict supports the allegations of the complaint. I think the order appealed from should be reversed.

Rehearing denied July 23, 1949.