LEE SHAMMEL, Plaintiff, Appellant and Respondent, v. GEORGE VOGL and ELIZABETH VOGL, his wife, Defendants and Appellants.

No. 10571

Submitted March 3, 1964. Decided September 17, 1964.

Rehearing denied November 16, 1964.

396 P.2d 103

Peter L. Rapkoch, County Atty., Lewistown, Hall, Alexander & Kuenning, Great Falls, Edward C. Alexander (argued), Great Falls, for plaintiff and respondent.

Anderson, Symmes, Forbes, Peete & Brown, Billings, Arthur P. Acher (argued), Helena, Charles E. Marshall (argued), Lewistown, Weymouth D. Symmes (argued), Billings, for appellants and defendants.

MR. CHIEF JUSTICE JAMES T. HARRISON, delivered the opinion of the Court.

This action is one to quiet title to a water right and its appurtenant ditch easement, hereinafter referred to as the Weidman right, and involves the East Fork of Big Spring Creek in Fergus County, Montana. The Creek flows north across the land of the defendants (George and Elizabeth Vogl) and then turns east a short distance onto the land of one Bacon before continuing to flow north and onto the land of the plaintiff (Lee Shammel). Plaintiff's land is, therefore, downstream of the defendants'. The legal description of the lands are quite checkered, but plaintiff's land lies in parts of Sections 10, 11, 14, and 15 and defendants' land lies in parts of Sections 22, 23, 26, and 35; all in T 14 N, R 19 E, MPM.

Shammel, the plaintiff, purchased his land in 1959 and began to use water under the Weidman appropriation to irrigate. During that year and again in 1960, he irrigated his land by means of the Weidman ditch. In 1961, defendant Vogl, dozed soil into part of the 600-foot section of the ditch that runs across the northern part of his land, and the plaintiff instituted this action.

The suit was brought to quiet the enjoyment of the Weidman water and ditch right, to establish the incidental privileges of entering the land of the defendants to maintain the diversion dam and headgate, and to enjoin the defendants from interfering with these rights of the plaintiff.

The defendants' answer concedes the validity of the Weid-

man water right, but alleges that the ditch right had been abandoned for some 30 years. Defendants also assert their rights to two other water rights located on their property, and upstream from the Weidman water right, being the Sears right and the Weldon right. The Sears right stems from an alleged appropriation of 500 inches made by one Sears on August 22, 1882, placed of record August 13, 1883. The Weldon right consists of an alleged appropriation of 500 inches on July 14, 1886, recorded August 13, 1886.

The plaintiff filed a reply to defendants' answer denying the validity of the filed notices of appropriation for the Sears and the Weldon water rights.

The case was tried before the court, sitting without a jury. The court held that the plaintiff was the owner of the Weidman water right of 325 inches as of August 31, 1886, that defendants' land is subject to a superior and dominant easement of the plaintiff to dam and divert waters of the creek, and that the plaintiff has a ditch right-of-way to convey the water across the defendants' land and onto his own. Plaintiff was also allowed the right to enter, inspect, clean or otherwise maintain the dam, headgate, and ditch. The defendants were found to be the owners of the Sears water right of 500 inches, and that this priority dates back to August 22, 1882. No mention was made in the decision of the defendants' alleged interest in the Weldon water right.

Both the plaintiff and the defendants appeal from that judgment. The defendants appeal on the grounds that the court erred in finding that the Weidman ditch right had not been abandoned. Defendants also assert a new objection to the recognition of the ditch right in a claim that the course of the ditch had been substantially altered by plaintiff, causing forfeiture of the ditch right. Defendants also urge that the Weldon right should have been recognized. As respondent to these objections, the plaintiff contends that no issue of forfeiture of the ditch right by alteration of its course was presented to the court and

that, in any event, there was no substantial alteration and no forfeiture. Plaintiff also contends the court properly found no abandonment. Finally, plaintiff, as respondent, contends that the court was justified in not recognizing the Weldon right because the notice of appropriation was not verified as the law requires. It appears the notarial certificate is dated 1885, but the notice refers to acts purportedly done in 1886. As appellant, the plaintiff contends that the Sears right should not have been recognized. The argument is that the water right cannot be sustained as a statutory appropriation because the Act authorizing such appropriations was not enacted until 1885, three years after the recording of notice of appropriation by Sears. Secondly, it is argued that even if that Act does apply, the Sears declaration was acknowledged only and not verified by the appropriator as required by the Act. Finally, it is urged that though there could have been an appropriation based on actual appropriation and beneficial use, these elements are missing and the water right ought not be sustained on this basis either.

The defendants' answering brief to the plaintiff's appellate brief states that the Sears water right was sufficiently proven and that cases have held that an appropriation notice placed of record before the 1885 Act may serve as evidence of a valid appropriation.

Because of the numerous issues presented by both parties the Weidman water and ditch rights, the Sears water right, and the Weldon water right will be discussed separately.

On August 31, 1886, John L. Weidman appropriated 325 miner's inches of water from the East Fork of Big Spring Creek to irrigate land in Sections 11 and 14, Township 14 North, Range 19 East. A diversion dam and headgate was used and the water was conveyed in a ditch five feet wide on top by sixteen inches deep. The water right notice was duly recorded on September 23, 1886, and appears on the records of Fergus

County. The ditch and right-of-way therefor are also claimed by this notice.

The record and exhibits show that the diversion is effected just east of the dividing line of Sections 14 and 15, but that the presently-established correct line runs over the center of the headgate and that immediately afterwards the ditch runs north and west for some 600 feet through the NE¼ of SE¼ of Section 15. This little stretch of land is now owned by the defendants, but in 1886 is was a part of the public domain; and the grant by the United States to defendants' predecessor in 1905 reserved to Weidman the ditch right-of-way.

The Weidman land was increased by subsequent patents from the United States. The record shows the intermediate owners of the Weidman lands together with the water and ditch right to be as follows: In 1889 Lang purchased the land from Weidman, resided thereon until selling it to Dwight Smith in 1945. Smith resided there for eight years, selling to Mangus Johnson in 1953. Johnson resided on it for one year and sold to Jess Howe in 1954. Jess Howe sold to plaintiff Shammel, in 1959, and Shammel has resided thereon ever since.

The contention of the defendants is that the ditch was not used during many lengthy stretches of time from 1886 to the present time, and that the 600 feet of ditch right over defendants' land has been thereby abandoned.

■ ■ In order for there to be abandonment there must be an intent to abandon. Rodda v. Best, 68 Mont. 205, 217 P. 669. An intent to abandon has not been found from mere nonuser. Abandonment has been held to mean a voluntary act involving a concurrence of act and intent. The act is the relinquishment of possession and the intent is a manifestation not to resume beneficial use of it. Neither of the elements alone is sufficient. Musselshell Valley F. & L. Co. v. Cooley, 86 Mont. 276, 295, 283 P. 213.

The testimony presented by the defendants is that according to the defendants Vogl the ditch was not carrying water from

1939 to 1956. One Kramlich, who resided on Big Spring Creek from 1914 to 1939 testified for defendants that the ditch was not used for that whole period of time. One Richter testified that he was hired by Jess Howe in 1956 to clean out the ditch with a dozer and that there wasn't much of a ditch to follow in cleaning it out. Burch testified that he could not recall irrigating from 1925 to 1934 and that in the ''wet'' year of 1955 he helped put up hay in the ditch for Jess Howe; hence, it was not being used to irrigate in that year. Ray Vogl, defendants' son, testified he lived in the ditch area since 1950 and that until 1956 had seen no use of the ditch for irrigation.

The above is the crux of the case for abandonment presented by the defendants. The court found that the ditch had not been abandoned, and the issue on appeal is whether the court could so find. The testimony presented by the planitiff may be summarized as follows:

Fishburn testified he fished in the water in the ditch from 1912 to 1917 with the Lang boys. Stephens irrigated for Lang using the ditch, from 1918 to 1919. Hall occasionally crossed the ditch from 1921 to 1925 and there was water in it being used for irrigation. He also testified that he saw water in the ditch in 1932. Jackson had cattle near the ditch in 1934 and 1935, and saw water in the ditch and knew Lang was irrigating with it. O'Reilly saw water in the ditch in 1926, 1932-33, and again in 1944, during visits to the Lang place. Bacon, an adjacent landowner, saw irrigation take place in 1941. Dwight Smith, who owned the present Shammel place from 1945 to 1953 testified that only because the seasons were ''wet'' did he not attempt to use the ditch for irrigation. He also testified that he had tried a sprinkler system and had studied use of the ditch and relocation of it by a Soil Conservation Service survey. In 1956 Jess Howe had the ditch dozed clear and began using it, this was continued by Shammel after he bought the place in 1959.

These witnesses fill the gap from 1912 to the present date. No

witnesses for pre-1912 use were available. The testimony shows that though the ditch was used off and on throughout that time there were periods of time when the ditch was not used and was, in fact, allowed to deteriorate to a degree. At least in one instance a man hired to doze out the ditch had difficulty following portions of it due to overgrowth and erosion of the sides of the ditch.

The question becomes whether it is necessary that the ditch be in constant use in order to prevent a finding of abandonment, and, if not, to what extent may the ditch be ignored without losing the right-of-way? In Moore v. Sherman, 52 Mont. 542, 159 P. 966, one Miller appropriated water for irrigation in 1892. He used it until he died in 1903. His widow did not use the water, and in 1911 Helen Pump succeeded to the ownership of the land and its appurtenances. Water and ditch rights along the creek were adjudicated in 1916, and for the five years prior to that time Helen Pump did not use the water or the ditch. The ditch had deteriorated so far as to be out of repair, overgrown, not capable of carrying water, and indistinguishable with the level of the ground. An argument that the ditch and water right had been abandoned in the ten or more years since the death of Miller was predicated upon a showing of lack of interest in the ditch. It was asserted that there was no use, no maintenance, no exercise of dominion, and no attempt to retain utilization of the ditch. But the court said: ''There was nonuser for 10 years, but nonuser does not constitute abandonment. If any principle of the law of water rights can be settled, this one is.'' 52 Mont. 542, at 546 159 P. 966, at 967. The court then quoted from the case of Featherman v. Hennessy, 42 Mont. 535, 113 P. 751: '' 'Mere lapse of time during which there is nonuser is not sufficient. The circumstances must be such as to justify an inference of intention to abandon; in other words, to leave the property to be taken by any other person who chooses to do so.' '' 52 Mont. 542, at 546, 159 P. 966, at 968.

It would seem clear to us from a reading of the transcript of the testimony that there was at the very least some sketchy use of the ditch throughout the years from 1912 to the present time. In at least one instance there is even an explanation of why the ditch wasn't used; in that there was a series of "wet" years.

The testimony presented by the defendants' witness Kramlich is very confusing. He was 81 years old and he often contradicts himself.

■■ The loss of a water right or a ditch right by abandonment is a serious occurrence in Montana and other semi-arid western states. The early case of Thomas v. Ball, 66 Mont. 161, 213 P. 597, stated in this connection: "The authorities are all of one accord in holding that the party claiming abandonment has the burden of proving his contention by a preponderance of the evidence, and that to establish abandonment the evidence to that effect should be clear and definite." 66 Mont. 161, at 168, 213 P. 597, at 600. We find no error in the court's finding that the Weidman ditch right had not been abandoned. Mere nonuser is not sufficient to establish abandonment, and the testimony presented by the defendants relates exclusively to establishing periods of nonuser. No evidence of intent to abandon is presented.

Insofar as the district court found no abandonment of the Weidman ditch right we affirm its decision.

In 1961 Vogl commenced an action against Shammel to enjoin him from flooding Vogls' land with his dam and from flowing water over and across Vogls' property. A hearing was had on the temporary restraining order and it was dissolved and vacated by the court.

Vogl then hired a bull-dozer and closed off the ditch by filling in approximately the first 140 feet of it inside his fence. This conduct prevented any use of the ditch during the 1961 irrigating season and precipitated this action.

Vogl contends that his conduct was justified because Shammel had moved the ditch in 1959.

It is difficult to understand what relief the defendants are seeking with regard to the issue of change of the course of the ditch.

■ We cannot excuse the conduct of the defendants in filling in the ditch after the court dissolved the restraining order. An alleged change in the course of the ditch does not warrant the defendants' rendering the ditch unuseable by filling it in. 28 C.J.S. Easements § 62, p. 729. Sufficient legal remedy is available to remove an alleged trespass or abuse of an easement right and the law does not condone self-help such as was done here. A claim of change of course does not excuse this action if that was the purpose of the defendants in presenting the issue on appeal.

Neither would it cause a forfeiture of the plaintiff's ditch right. In Hansen v. Galiger, 123 Mont. 101, 208 P.2d 1049, the relief sought was an injunction to enjoin continued trespass, and not to cause a forfeiture of the easement altogether. The general rule is: ''The right to an easement is not lost by using it in an unauthorized manner or to an unauthorized extent, unless it is impossible to sever the increased burden so as to preserve to the owner of the dominant tenement that to which he is entitled, and yet impose on the servient tenement only that burden which was originally imposed on it without the obligation attempted to be imposed on it by alterations.'' 28 C.J.S. Easements § 62, p. 729. Hence, it is clear that the assertion by the defendants that there has been a change in the course of the ditch could, at best, serve to require the plaintiff to restore the ditch to substantially the same path it always followed, but certainly no forfeiture of the right to use the ditch at all results.

The judgment has the effect of providing that the ditch is to be situated as defined in the Weidman Notice of Appropriation. This means that it is to be five feet wide at the top by sixteen

inches deep, and is to follow its original course commencing, "* * * at a point on its west bank on the Southwest Quarter of Section 14, Township 14 North, Range 19 East; thence, over and across the Northeast Quarter of the Southeast Quarter of Section 15, in the same Township and range, on lands now owned by the Defendants, for a distance of approximately six hundred feet (600'); thence, over other lands not here involved to the lands of John L. Weidman * * *."

The dimensions of the ditch are set forth, and cannot be materially altered from the original course. Even though the ditch has never been surveyed or described by metes and bounds the rule is that the ditch is to substantially follow the original course chosen and used by Weidman and his immediate successor, Lang, unless a change is agreed upon between the plaintiff and defendants. Felsenthal v. Warring, 40 Cal. App. 119, 180 P. 67, at 69.

Whether the ditch in its present location follows substantially the original pathway is an issue we cannot decide. The issue was not raised by the pleadings, but also the evidence is not sufficient in description of the locations, the scant testimony is highly conflicting, and no findings on the matter were made by the court, nor was any request made for such findings. Further, it appears that the first 140 feet of the ditch have been filled in by the defendants. However, we will set forth our views on the issue of change in course only in order to effectuate this decision and to give the plaintiff some guide in his effort to make the ditch operative as quickly as possible.

One with a ditch easement also has a secondary easement to enter and inspect, repair, maintain or otherwise use the easement. Laden v. Atkeson, 112 Mont. 302, 116 P.2d 881. Also: "So long as the use of an easement is confined to the purposes under which it was acquired and created without increasing the burden on the servient estate, the owner of the easement * * * may make changes that do not impair or affect its substance." 28 C.J.S. Easements § 95b, p. 777 n. 72. Mon-

tana agrees with this general rule and has held that a ditch easement may not be substantially enlarged or materially changed or it will be deemed an increased burden on the servient estate. Hansen v. Galiger, supra. But implicit in this rule is the above general rule that immaterial changes may be made in a proper case.

The two California cases cited by defendants indicate that only a minimal amount of alteration or change will be tolerated. Felsenthal v. Warring, 40 Cal.App. 119, 180 P. 67; Vestal v. Young, 147 Cal. 715, 82 P. 381; see also Hannah v. Pogue, 138 P.2d 790 (Cal.App.1943), and again in 23 Cal.2d 849, 147 P.2d 572, 575 (1944). These cases indicate that any actual relocation of a ditch, no matter how near the original ditch, will not be allowed. There is a distinction, however, between such actual relocations and mere meandering along the course of the original ditch. The Felsenthal, Vestal, and Hannah cases seem to be more involved with substantial changes in the form of relocation than with mere meandering within the marginal lands of the original easement.

Changes caused by a dozer in clearing the Weidman ditch will not be considered substantial changes or material alterations if they involve minor meandering along the course to account for topographical adjustments in the terrain. The degree of meandering along the course of the original ditch and its marginal land is determined by a test of reasonableness in clearing the ditch in light of the conditions encountered along the ditch course. The Laden case, supra, is helpful in this connection:

"[T]he amount allowed for such purposes [amount of marginal land for maintenance and repair] is indefinite and uncertain. In the very nature of such an easement the extent thereof cannot be predetermined with certainty. It may be that portions of plaintiffs' ditches may never need attention other than casual inspection. Naturally, then, little or no land on either side of such portions will be needed for purposes of

repair or otherwise. Other parts of the system may need constant attention and repair, in which event the secondary easement requirements of plaintiffs may be much greater. The court's judgment in that instance, as in all others, limits the use by plaintiffs to a reasonable amount of defendant's land. That the term 'reasonable' is relative, we concede, but in each instance the amount used would constitute a question of fact, determination of which would disclose whether the privilege of reasonable usage had been abused. * * * [A]ction will lie for such abuse." 112 Mont. 302, at 310-311, 116 P.2d 881, at 885-886.

While that case involved using the marginal land for fill in the ditch we feel that the enroachment on the marginal land while dozing out a ditch involves the same principle.

R.C.M.1947, § 89-803, states:

"The person entitled to the use of water may change the place of diversion, if others are not thereby injured, and may extend the ditch, flume, pipe, or aqueduct, by which the diversion is made, to any place other than where the first use was made, and may use the water for other purposes than that for which it was originally appropriated."

This court has construed this section to mean that the location of a flume maintained over the land of another may be changed so long as the change adds no new burdens to the servient estate or causes additional damage thereto. Pioneer Mining Co. v. Bannack Gold Mining Co., 60 Mont. 254, 265, 198 P. 748. Although not clear from the report of that case the location of the flume was apparently only changed slightly, perhaps a few feet. Therefore, there appears to be statutory authority in Section 89-803 for some minor and immaterial changes in the course of a flume, pipe, aqueduct, or ditch.

Plaintiff, as appellant, raises the next issue in this case. Plaintiff objects to the admission into evidence of the record of the Sears water right as a statutory appropriation, and to the fact that the record was given legal effect as of August 22,

1882. The record involved in this issue consists of a notice of an appropriation of 500'' of water as of August 22, 1882, by Caleb S. Sears and filed of record August 17, 1883.

On March 12, 1885, the statutory appropriation act was passed in Montana. Since 1885 two distinct methods of appropriating water exist. One is by complying with the rules and customs of the early settlers; consisting of actual appropriation and application to a beneficial use. The other is by complying with the terms of the statutes passed pursuant to the 1885 Act. The 1885 Act contained a savings clause (Sec. 9, Laws of 1885, p. 132) which provided that if those with water rights acquired prior to the Act would file notice in accordance with the Act within six months of the publishing of the Act, then the notice would serve as prima facie evidence of their right and relate back to the date of appropriation. This provision included those who had, by chance, filed some sort of notice of appropriation prior to the Act. The full text of the statute is:

''Persons who have heretofore acquired rights to the use of water shall, within six months after the publication of this chapter, file in the office of the county clerk of the county in which the water right is situated, a declaration in writing, *except notice be already given of record as required by this chapter, or a declaration in writing be already filed as required by this section,* containing the same facts as required in the notice provided for record in section 89-810 of this chapter, and verified as required in said last-mentioned section, in cases of notice of appropriation of water; provided, that a failure to comply with the requirements of this section shall in nowise work a forfeiture of such heretofore acquired rights, or prevent any such claimant from establishing such rights in the courts.'' R.C.M.1947, § 89-813. (Emphasis added.)

It is evident from the emphasized portion of that statute that one could have filed a notice of appropriation before the 1885 Act and if that notice happened to comply with the requirements for notice under the Act then that notice is to be given the

benefit of the Act. The benefit is provided in Section 89-814: "The record provided for in sections 89-810 and 89-813, when duly made, shall be taken and received in all courts of this state as prima facie evidence of the statements therein contained."

It is also to be noted that no rights were lost if no notice was filed, but only such rights would have to be proven by showing compliance with the rules and customs of the early settlers with no record providing prima facie evidence of actual taking and beneficial use. It was said in Salazar v. Smart, 12 Mont. 395, 401-402, 30 P. 676, 678:

"The act provided that prior acquired water rights shall not be forfeited, even by failure altogether to record the same, but such right may be established in court. If recorded in compliance with the provisions of said act, the record of the facts required to be set forth in the verified statement becomes *prima facie* evidence of such facts. This was an inducement to place declarations of such rights on record."

Hence, if the record in the instant case conforms to the requirement of the emphasized portion of Section 89-813, supra, then the Sears water right record is prima facie evidence of an appropriation of 500 inches. The requirements of R.C.M.1947, § 89-810, are as follows:

The notice must contain: The quantity of water claimed designated in cubic feet or miner's inches; the purpose for which the water is claimed and the place of intended use; the means of diversion, including size of ditch, etc., by which diversion will be made; the date of the appropriation; the name of the appropriator; the name or description of the stream from which diversion is made; an accurate description of the point of diversion, with reference to some natural object or permanent monument; and, finally, the notice is to be verified by the affidavit of the appropriator or someone in his behalf, which affidavit must state that the matters and facts contained in the notice are true.

Exhibit "A," the Sears notice, contains the following: A claim of 500 miner's inches for agricultural, water wheel, and all useful purposes in Section 23 and 26 of Township 14 North, Range 18 East. The water was first taken August 22, 1882, by means of a ditch six feet by twenty inches. Caleb S. Sears is designated the appropriator and Big Spring Creek as the stream from which the water was diverted. The water is stated to have been taken from the west side, near the northwest corner of the NE¼ of the NE¼ of Section 35, Township 14 North, Range 19 East. The affidavit verifies that Sears is who he says he is, but it does not state that the matters and facts contained in the notice are true, as required by Section 89-810.

It has been held that a notice of appropriation of a water right is fatally defective if it is not verified in conformity with Section 89-810. Murray v. Tingley, 20 Mont. 260, 265, 50 P. 723.

The notice of appropriation in the instant case is not in conformity with the statute, and, therefore, constitutes a fatal defect. A notice of appropriation filed before the 1885 Act has been held to be defective in that it did not comply with the notice requirements of R.C.M.1947, § 89-810, in Stearns v. Benedick, 126 Mont. 272, 274-275, 247 P.2d 656. In that case there was an insufficient description of the land in a notice fileld in 1869, and the court held that the claimant was not entitled to any water right by virtue of such notice.

We feel the instant case is in accord with the Stearns case on this point. Here the verification is not completed as prescribed by the statute. Since the notice on the record was not duly made, it is not entitled to prima facie evidentiary value under R.C.M.1947, § 89-814.

In Galahan v. Lewis, 105 Mont. 294, 72 P.2d 1018, it was held that a notice of appropriation not filed within the time provided in the savings clause of the original recording act of 1885 was of *no evidentiary value* in proving the amount or date of an appropriation. This case would seem to be holding that not only would such defective notice not be prime facie

evidence, it would not be admissible into evidence at all. The notice in the Galahan case was defective because not filed in time, here the notice is defective in its affidavit. We see no difference between the two situations.

If the Sears water right exists, it will have to be shown as a water right acquired prior to the 1885 Act and without the benefit of that Act. The essential features of an appropriation of water made prior to the 1885 Act are a completed ditch and actual appropriation and application of an amount of water to a beneficial use. One of plaintiff's witnesses, Paul Fishburn, testified on cross-examination that he saw water in the Sears ditch in 1912. Then the defendant, George Vogl, testified that he has used the ditch and water since 1940. This is all the evidence presented to establish the Sears water right of 500 inches allegedly dating back to 1882. Even if the notice of appropriation is admissible as evidence, we feel that the evidence would not be sufficient to establish how much water was actually taken and used for all those years from 1882 to 1940. In Allen v. Petrick, 69 Mont. 373, 222 P. 451, this court explored the idea of early appropriations of large amounts of water in situations where such excessive amounts were never put to a beneficial use. The court stated: "In Montana, as elsewhere, when the early settlers made their original appropriations they had little knowledge of the quantity of water necessary to irrigate their lands to good advantage. Ample quantities of water being available in the streams, the settlers claimed extravagant amounts." 69 Mont. 373, 377, 222 P. 451, 452-453.

We hold under the situation here prevailing that the record of the Sears right was not properly admitted into evidence, and that the evidence otherwise presented is insufficient to establish the Sears water right. We, therefore, reverse that part of the judgment decreeing the defendants the Sears water right.

The final issue in this case is error assigned by de-

fendant's Specification No. 6 in that the court failed to recognize the Weldon water right. This alleged water right stems from an appropriation of 500 inches made by James M. Weldon on the East Fork of Big Spring Creek. The point of diversion is from the west bank of the creek in the SW¼ of Section 23, and the water irrigates defendants' land in Sections 22 and 23. The notice recites that the appropriation was made on July 14, 1886. The instrument is dated August 10, 1886. The act shows the notice to have been subscribed and sworn to before the notary on August 10, 1885. Finally, the notice was recorded on August 13, 1886.

The contention of the plaintiff is that since the notary's certificate is dated 1885 and the notice refers to acts done in 1886 the notice is not verified as required by law and, hence, it was proper for the court to not recognize the Weldon water right.

R.C.M.1947, § 89-810, requires that the notice be verified by affidavit. This court has held: "The affidavit which the statute requires shall be a part of the notice of appropriation serves the same purpose as, and is of equal dignity with, an acknowledgement." Musselshell Valley F. & L. Co. v. Cooley, 86 Mont. 276, 288, 283 P. 213, 216.

In 1 Cal.Jur.2d, Acknowledgements, § 29, it is said:

"If the certificate of acknowledgement is dated earlier than the instrument, but it is clearly shown that the date is erroneous, that fact alone does not invalidate the certificate. In fact, if no date appears in the certificate, or if the date is rendered by evidence within the certificate itself so doubtful as to destroy its force, the certificate is presumed to have been made at the date of the instrument."

In form the certificate of acknowledgement in the instant case complies with the requirements of Section 89-810, but the date of the certificate is one year prior to the date of the instrument and the date of the recording of the instrument. If the year "1886" is inserted instead of "1885" the chain of

events makes sense. It does appear to be a mere clerical mistake. In Brown v. Title Insurance & Trust Co., 51 Cal.App. 65, 196 P. 114, a certificate of acknowledgement in a grant was dated two years prior to the date of the grant and the court stated:

"It is apparent from an inspection of the instrument itself that said defect was a clerical error. No fraudulent design is charged against the notary who committed the error."

The court held on this point:

"The fact that a notarial certificate is dated earlier than the deed, when it is clearly shown by a reference to the deed that such date is erroneous, does not alone invalidate the certificate.

"It has been held no error to admit a deed in evidence, although the certificate of acknowledgement bears date prior to the acknowledgement of the deed if from the instrument it appears that it was actually made at the time of its acknowledgement, and that the conflict in dates arises from a mere clerical error. [Citations omitted.]

"States having statutes requiring that the true date of the making of an acknowledgement of an instrument shall be stated in the certificate thereof have held the rule to be that it is sufficient if the date appears by evidence within the instrument itself." [Citations omitted.] 196 P. 114, at 116-117.

The record in this cause does not end here with respect to the Weldon right, however, and this testimony given by the defendant George Vogl is extremely pertinent:

"Q. And now these water rights that we introduced here as Exhibits A and B, have you, you know those water rights, do you not? A. Yes.

"Q. One of them is known as the Sears Right [Exhibit A] and the other is the Weldon Right. [Exhibit B] Did you use these ditches? A. I used one of them steady since 1940 until the present time. [Sears Right.]

"Q. And how about the other one? [Weldon Right] A.

The other one we used this last summer. [1961]'' (Bracketed insertions supplied.)

Upon cross-examination he testified:

''Q. The other ditch that you speak of is this Weldon Ditch, is it not? A. Yes.

''Q. That one you just put it in last summer? A. Yes. *We put that one in last summer.* (Emphasis Ours.)

''Q. You started using water out of that ditch after Mr. Shammel's ditch was closed off? A. Yes.''

This constitutes the sum total of the testimony as to the use of the Weldon right. First, a prima facie showing by the Notice of Appropriation of an appropriation on July 14, 1886, and proof by testimony of the defendant himself that he started taking water from the creek in the summer of 1961.

We had occasion in Vennes v. Nollmeyer, 144 Mont. 43, 394 P.2d 178, decided on July 16 of this year, to make a pertinent observation: ''But, we have searched the record from end to end and find no satisfactory proof, as such, as to when the ditches were built. No evidence of diversion, use of the ditches by predecessors of plaintiff, or plaintiff herself for that matter.''

On the state of the record in this cause the court was confronted with a prima facie showing immediately followed by testimony destroying its efficacy. In such a situation the court was not in error in refusing to recognize any rights claimed under the Weldon appropriation.

The cause is remanded to the district court for the entry of findings and conclusions and appropriate decree in accordance with the views herein expressed.

MR. JUSTICES CASTLES, JOHN CONWAY HARRISON, ADAIR, and DOYLE, concur.