No. 00-100

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 216

IN THE MATTER OF THE ADJUDICATION OF THE EXISTING RIGHTS TO
THE USE OF ALL THE WATER, BOTH SURFACE AND UNDERGROUND,
WITHIN THE MISSOURI RIVER DRAINAGE AREA, INCLUDING ALL
TRIBUTARIES OF THE MISSOURI RIVER IN BROADWATER, CASCADE,
JEFFERSON AND LEWIS AND CLARK COUNTIES, MONTANA (BASIN 41I)

**FILED**

APPEAL FROM:     The Montana Water Court,
                 Honorable C. Bruce Loble, Chief Judge

SEP 2 4 2002

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

COUNSEL OF RECORD:

For Appellant:

    G. Steven Brown (argued), Attorney at Law, Helena, Montana

    Robert N. Lane, Montana Department of Fish, Wildlife and Parks,
    Helena, Montana

For Respondent:

    Honorable C. Bruce Loble (argued), Chief Water Judge; Colleen Coyle, Water
    Master, Montana Water Court, Bozeman, Montana

For Amici Curiae:

    David W. DePuy (argued), DePuy Law Firm, P.C., Livingston, Montana;
    William L. Madden, Jr., William L. Madden, Jr. P.C., Bozeman, Montana
    (Estate of Eva S. DePuy)

    Lois J. Schiffer, Assistant Attorney General; Jeffrey Dobbins and Mark
    R. Haag (argued), Attorneys, United States Department of Justice;
    Alexandra L. Davis, Office of the Solicitor, United States Department of
    Interior (United States of America)

    Laura Ziemer (argued), Bozeman, Montana (Montana State Council of
    Trout Unlimited)

    John E. Bloomquist (argued), Doney, Crowley, Bloomquist & Uda, Helena,
    Montana (Montana Stockgrowers Association)

    Senator Lorents Grosfield, Big Timber, Montana (*Pro Se*)

Argued and Submitted: May 22, 2001
Decided:   September 24, 2002

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1     The Montana Department of Fish Wildlife and Parks (DFWP) appeals a ruling by the Chief Water Judge on five pre-1973 water rights claims in the Missouri River basin. The five claims are based on diversions of water for purposes of fish, wildlife or recreation. The Water Court ruling refers to *In the Matter of Dearborn Drainage Area* (1988), 234 Mont. 331, 766 P.2d 228 (*Bean Lake*) in remarking on the potential invalidity of the claims. This Court invited submission of *amicus curiae* briefs and received briefs from: Estate of Eva S. Depuy; Montana State Council of Trout Unlimited; Montana Stockgrowers Association; Senator Lorents Grosfield; and the United States. Only DFWP can represent citizen interests in the adjudication process and, in light of our decision in *Bean Lake*, DFWP presently asserts only those fish, wildlife and recreation claims that involve diversions. To provide guidance to the Water Court, we must resolve the *Bean Lake* confusion and address not only the question of whether fish, wildlife and recreation uses are recognized as beneficial uses for appropriation purposes, but also whether a diversion is required for appropriation purposes.

¶2     We restate the issues as follows:

   I      Was *Bean Lake* correct in its holding that "under Montana law before 1973, no appropriation right was recognized for recreation, fish and wildlife, except through a Murphy right statute?"

   II     Does the Water Court's use of the "*Bean Lake* remark" violate the Supreme Court's Water Right Claim Examination Rules 5.II and 5.IV(1)(a)?

2

**Jurisdictional Issues**

¶3 The Water Court asserts that the DFWP's appeal is procedurally defective. The Water Court points out that a Master's Report was issued with regard to the five DFWP claims involved. The Master's Report denied the DFWP's requests, and after the ten-day objection period provided for in Rule 53(e), M.R.Civ.P., and Claim Examination Rule 1.II(4) lapsed, without any objection from DFWP, the Chief Water Judge adopted the Master's Report. The Chief Water Judge correctly points out that when objections are filed, the Water Court researches the issues raised and issues an extensive written opinion which, in turn, facilitates review by the appellate court. Accordingly, the Water Court urges this Court to dismiss this appeal or, in the alternative, convert the appeal to a petition for declaratory relief or supervisory control. DFWP asserts that strict compliance with Rule 1.II(4) of the Claim Examination Rules is not necessary here since it has consistently and repeatedly objected to the Water Court's insertion of its *Bean Lake* remark and that the Water Court has adopted an unwavering policy of rejecting DFWP's arguments concerning this policy even when DFWP has filed objections to the master's reports. Nonetheless, DFWP indicates that it has no objection to the Court's reclassifying this appeal as a petition for declaratory relief or supervisory control.

¶4 While we agree with the Water Court that compliance with Rule 1.II(4) of the Claim Examination Rules is critical to effective appellate review, we determine, given that our decision in *Bean Lake* is the genesis of the alleged confusion which the parties seek to resolve, it is appropriate that we treat this matter as a continuation of the 1988 Bean Lake

3

controversy wherein we exercised supervisory control. Accordingly, as we did in *Bean Lake*, we accept jurisdiction and exercise our power of general supervisory control over the Water Court, pursuant to Article VII, Section 2(2), of the Montana Constitution and Rule 17, M.R.App.P. Taking jurisdiction now on these purely legal issues will resolve confusion in our case law, promote judicial economy, expedite determination of existing water rights and assist in avoiding protracted litigation. *McDonald v. State* (1986), 220 Mont. 519, 524, 722 P.2d 598, 601.

**Facts and Procedure**

¶5 This case involves five pre-July 1, 1973, water appropriation claims in the Missouri River basin. DFWP filed the five claims based on diversions for fish, wildlife and recreation purposes for adjudication in the Water Court. The Water Court inserted in the abstracts for the claims a remark (hereafter "*Bean Lake* remark") stating:

> There is a question as to the validity of this claimed right. In the Matter of the Dearborn Drainage Area, 234 Mont. 343 (1988) (the Bean Lake case) the Montana Supreme Court stated: "It is clear therefore that under Montana law before 1973, no appropriation right was recognized for recreation, fish and wildlife, except through a Murphy right statute."

¶6 Without ruling on any issue, the Water Court's remark highlights the conflict in our case law regarding whether appropriations of water for fish, wildlife and recreation purposes are valid under the prior appropriation doctrine before 1973.

¶7 DFWP objected to the insertion of the remark and requested that the Water Court remove the remark from the abstracts of the five claims. Following submission of briefs and a hearing, the Water Court denied DFWP's objections and retained the *Bean Lake* remark.

4

The Water Master issued a "Report and Memorandum and Order" finding that the five claims fell within the parameters of the *Bean Lake* decision and that therefore the insertion of the *Bean Lake* remark was appropriate. DFWP did not object to this Report, and the Chief Water Judge subsequently adopted the Master's Report.

¶8    After repeatedly objecting to the insertion of Bean Lake remarks and receiving consistent denials in the Water Court, DFWP appealed to this Court for resolution of the conflict in our case law as to whether appropriations for fish, wildlife and recreation uses are valid water rights under prior appropriation law. The Water Court objected to appearing as respondent in this case, and this Court issued an order that the Water Court, as author of the *Bean Lake* remark, was a proper respondent in these proceedings. Given the on-going and state-wide significance of the issue, we invited all interested parties to submit *amicus curiae* briefs.

## DISCUSSION

I    Was *Bean Lake* correct in its holding that "under Montana law before 1973, no appropriation right was recognized for recreation, fish and wildlife, except through a Murphy right statute?"

**Water Law in the American West: The Doctrine of Prior Appropriation**

¶9    Miners in California developed a water use system as an alternative to the riparian water system prevalent in England and the eastern United States. While riparians allowed owners of land abutting the water source to control it, the more arid climes of the American West required a different approach. Prior appropriation, adapting flexibly to the needs of a developing society, allowed diversion to a distant location and simply required use of the

5

water for a beneficial purpose. Western states adopted the miners' customs through both court decisions and codification, and the doctrine of prior appropriation became the law of the western states. A. Stone, *Selected Aspects of Montana Water Law* 7 (1978); Christine A. Klein, *The Constitutional Mythology of Western Water Law*, 14 Va. Envtl. L.J. 343, 347-48 (1995).

¶10 The common law elements of a valid appropriation are intent, notice, diversion and application to beneficial use. However, in Montana, as in many western states, the flexibility of the prior appropriation doctrine has allowed acquisition of the right to use a specific amount of water through application of the water to a beneficial use. A. Stone, *Montana Water Law* (1994). Judicial opinions and scholarly commentators have repeatedly stated the rule that application to a beneficial use is the touchstone of the appropriation doctrine. *See, e.g.,* A. Stone, *Selected Aspects of Montana Water Law* 30 (1978); *Thomas v. Guiraud* (1883), 6 Colo. 530, 533 ("[t]he true test of appropriation of water is the successful application thereof to the beneficial use designed, and the method of diverting or carrying the same, or making such application, is immaterial").

**Bean Lake**

¶11 *Bean Lake* involved a claim for inlake water rights for fish, wildlife and recreation purposes in a natural pothole lake. In *Bean Lake* this Court stated, "[i]t is clear therefore that under Montana law before 1973, no appropriation right was recognized for recreation, fish

6

and wildlife, except through a Murphy right statute."[1] *Bean Lake*, 234 Mont. at 343, 766 P.2d at 236.

¶12 The *Bean Lake* decision appears to be inconsistent with earlier case law in which the Court recognized appropriations for fish, wildlife and recreation. *See, e.g., Osnes Livestock Co. v. Warren* (1936), 103 Mont. 284, 62 P.2d 206, and *Paradise Rainbows v. Fish and Game Commission* (1966), 148 Mont. 412, 421 P.2d 717. In holding that no appropriation right was recognized for fish, wildlife and recreation, the *Bean Lake* Court ignored *Osnes* and misread *Paradise Rainbows*. The *Osnes* Court ruled that an earlier diversion of water, even if used only to maintain a swimming pool or fish pond, had priority over a later appropriation and stated, "it is not clear that such a use [swimming pool or fish pond] would not be a beneficial use and hence the basis of a valid appropriation." *Osnes*, 103 Mont. at 302, 62 P.2d at 214. The *Bean Lake* Court neglected to discuss or acknowledge the *Osnes* precedent.

¶13 In *Paradise Rainbows*, the Court again recognized the diversion of water for fish ponds as a valid appropriation of water. The *Paradise Rainbows* holding explicitly validated a diversionary appropriation for fish. In *Bean Lake*, however, the Court concentrated solely on the *Paradise Rainbows* Court's unwillingness, under the peculiar facts of that case, to

---

[1] The 1969 Montana Legislature created a procedure by which the Fish and Game Commission could appropriate instream flows for fish, wildlife and recreation purposes on certain designated streams. Section 89-801, RCM (1947).

7

protect an instream fish and recreation right and, consequently, overlooked the fact that in *Paradise Rainbows* the Court upheld a diversionary appropriation of water for fish.

¶14 The majority of briefs submitted in this case concur that the *Bean Lake* decision is fraught with internal inconsistencies. In *Bean Lake*, the Court acknowledged that beneficial use is the touchstone of a valid appropriation right. *Bean Lake*, 234 Mont. at 340, 766 P.2d at 234. The Court noted that Article IX, Section 3, of the 1972 Montana Constitution recognized recreation as a beneficial use and accepted "as given that the activities of the DFWP in stocking Bean Lake, maintaining the fishery resource . . . coupled with the general public use of Bean Lake for the purpose of recreation, wildlife and fishing constituted a beneficial use of the waters within the meaning of the appropriation doctrine." *Bean Lake*, 234 Mont. at 339, 766 P.2d at 233.

¶15 In seeming conflict with these findings that (1) beneficial use is the test of a valid right, and (2) fish, wildlife and recreation uses are beneficial uses, the Court concluded that "no Montana legal authority, deriving from common law or statute, acknowledged that recreational, fish or wildlife uses, even though beneficial, gave rise to any water rights by appropriation under Montana law" and therefore "under Montana law before 1973, no appropriation right was recognized for recreation, fish and wildlife . . . ." *Bean Lake*, 234 Mont. at 340, 343, 766 P.2d at 234, 236.

    A.    Did the Bean Lake Court correctly hold that prior to 1973 Montana did not recognize water rights for recreation, fish and wildlife purposes under the appropriation doctrine?

8

¶16     In *Bean Lake*, the Court cited and discussed *Paradise Rainbows*, in which this Court specifically recognized as a valid appropriation a diversion of water for fish propagation. There is no hint in the *Bean Lake* decision of an intent to overrule *Paradise Rainbows*. *Bean Lake* is no model of clarity, ignores *Osnes* altogether, fails to appreciate the ultimate holding in *Paradise Rainbows* precedent and incorrectly states Montana law. Prior to 1973, Montana explicitly recognized water rights for fish, wildlife and recreation uses. Montana was not alone in recognizing as beneficial the use of water for fish, wildlife and recreation purposes. *See, e.g., Faden v. Hubbell* (Colo. 1933), 28 P.2d 247, 250-51 ("[i]t is self-evident that water diverted and employed for the propagation of fish is devoted to a useful purpose, and all of the parties completed their appropriations of water by its application to the beneficial use designed"); *State ex rel. State Game Commission v. Red River Valley Co.* (N. M. 1945), 182 P.2d 421, 428 ("we are unable to find authority, or justification in reason, to support the claim that the 'beneficial use' to which public waters, as defined in this and other jurisdictions, may be put, does not include uses for recreation and fishing").

¶17     To the extent *Bean Lake* suggests that fish, wildlife and recreation are not beneficial uses, it simply misstates Montana precedent and is hereby overruled. We next address whether *Bean Lake* correctly held that non-diversionary water rights for fish, wildlife and recreation purposes were not recognized in Montana under the doctrine of prior appropriation.

> B.      Does *Bean Lake* correctly hold that claims for the non-diversionary use
> of water for fish, wildlife and recreation are not recognized in Montana
> law under the prior appropriation doctrine?

9

¶18    In arguing this matter to the Court, DFWP has strenuously contended that, since the five water right claims which are the subject of the Department's appeal all involve diversions of water, the Court should correct the language in *Bean Lake* as it applies to diversionary rights but should leave the *Bean Lake* holding in tact as it applies to non-diversionary claims. The dissent also argues that the Court, in addressing non-diversionary uses, is going outside the issues and should confine itself to diversionary rights. We determine that such a restricted clarification would be inconsistent with the fact that the *Bean Lake* remark which has given rise to this appeal is being applied by the Water Court to both diversionary and non-diversionary pre-July 1, 1973, claims, and that the *Bean Lake* decision itself arose out of DFWP's claim for an instream, non-diversionary claim to the water in a natural pothole lake. Finally, in the *Bean Lake* paragraph which is the primary source of the present confusion, the Court specifically eschewed any reliance on a distinction between diversionary and non-diversionary claims when it concluded "[w]hatever the merits of the lack of diversion argument, the DFWP and the public could not have intended an appropriation where none was recognized by law, and for the same reason, adverse appropriators could not have had notice of such a claim."[2] *Bean Lake*, 234 Mont. at 343, 766

_____

[2]The Court further exacerbated the confusion when it issued a second decision on the Bean Lake matter, *Matter of Dearborn Drainage Area* (1989), 240 Mont. 39, 782 P.2d 898 (*Bean Lake II*), in which it rejected the Montana Stockgrowers Association's request for attorneys fees for its role in the original *Bean Lake* case. In dictum, the Court purports to summarize the *Bean Lake* holding, and, in doing so, seems to recognize a distinction between diverted and non-diverted rights.

    The Water court ruled, and we affirmed, the Department had no appropri-
    ation right in Bean Lake predating 1973, because before that time no such

P.2d at 236. Thus, given the facts of *Bean Lake*, the language of the *Bean Lake* decision and the broad application of the resulting *Bean Lake* remark, it is necessary that we address the question of whether the *Bean Lake* decision correctly holds that claims for the non-diversionary use of water for fish, wildlife and recreation are not recognized in Montana law under the prior appropriation doctrine.

¶19 After the *Bean Lake* Court concluded that prior to 1973, Montana did not allow appropriation of water for fish, wildlife and recreation purposes, the Court essentially skipped the traditional appropriation analysis. Rather than evaluating whether DFWP had intended to appropriate water and whether DFWP provided notice of its intent, the Court simply stated that because Montana did not recognize water rights for fish, wildlife and recreation purposes, DFWP could not have intended to appropriate water for those purposes, and thus adverse water users could not have had notice of any such intent. It is unclear from the opinion itself, whether the Court denied the appropriation for Bean Lake because there was no diversion or because it found there was no notice of intent to appropriate. To resolve the confusion engendered by *Bean Lake*, we now determine whether a valid appropriation of water may be established without a diversion where no diversion is physically necessary for the intended use.

---

right was recognized for recreation, fish and wildlife. Before 1973, some form of diversion was necessary for an appropriation. Because the right asserted by the Department lacked the elements of "diversion, intent and notice," we held that the Department, for itself or for the public, had no valid water right which predated the 1973 Water Use Act.

*Bean Lake II*, 240 Mont. at 41, 782 P.2d at 899.

¶20    While most traditional uses necessitated a diversion of water for application to beneficial use, the appropriation doctrine's history of flexibility and practicality support a holding that a diversion is not required where the application to beneficial use does not physically require a diversion. Common sense rebels against a rigid diversion requirement that would refuse to recognize an acknowledged beneficial use simply because application to the use does not require removal from and depletion of the water source. In accordance with the doctrine's flexibility, we find that a diversion is not a requisite element of an appropriation when it is not a physical necessity for application to a beneficial use.

¶21    More than one commentator has warned against the strict adherence to traditional elements, such as diversion, when the element no longer serves its original purpose. These scholars also note that beneficial use is the only essential element of a valid appropriation. *See, e.g.*, Tarlock, *Appropriation For Instream Flow Maintenance: A Progress Report on "New" Public Western Water Rights*, 1978 Utah L. Rev. 211, 221 ("Most western water experts agree that the actual diversion requirement serves no function that cannot be served by other water law doctrines and statutory procedures. Thus the real issue is whether these uses are beneficial"); Christine A. Klein, *The Constitutional Mythology of Western Water Law*, 14 Va. Envtl. L.J. 343, 351 (1995) ("Rigid adherence to the diversion requirement has increasingly restricted the traditional flexibility of the ideas of beneficial use and waste. Although appropriation to beneficial use is the true measure of a water right, diversion has frequently been substituted as the constitutional requirement").

12

¶22    Under prior appropriation, a diversion traditionally served dual purposes—providing notice of a user's intent to appropriate water, and defining the extent of the use. In *Wheat v. Cameron* (1922), 64 Mont. 494, 210 P. 761, this Court explained that intent to appropriate is to be determined from the specific facts and circumstances pertaining.

> It is argued by defendants' learned counsel that no intent to make an appropriation from Mill Creek on the part of [plaintiffs' predecessors] is shown, and therefore the adjudication is not warranted. . . . Intent to appropriate will be *presumed from these facts*, showing, as they do, diversion and use of Mill Creek waters for irrigating purposes. *A claimant's intent at the time of appropriation must be determined by his act and by surrounding circumstances,* its actual and contemplated use, and the purpose thereof. (*Toohey v. Campbell*, 24 Mont. 13, 60 Pac. 396.) Actual diversion and beneficial use existing or in contemplation constitute an appropriation [citations omitted], and *from this evidence* it is plain that water from Mill Creek was in fact appropriated in the spring of 1867 by [plaintiffs' predecessors], as found by the court. And the change in the point of diversion or place of use did not affect the appropriation.

*Wheat,* 64 Mont. at 501, 210 P. at 763 (emphasis added).

¶23    In accordance with the historical flexibility of the doctrine of prior appropriation, the *Wheat* Court held that although intent could be *presumed* from actual diversion, intent could be proven through other facts and surrounding circumstances. Similarly, in *Bean Lake*, the Court noted that diversion could provide notice or proof of an intent to appropriate. *Bean Lake,* 234 Mont. at 339, 766 P.2d at 233. These decisions do not require a diversion for proof of intent. To the contrary, the opinions suggest that although a diversion may provide proof, intent is the essential element and may be proven through means other than a diversion. In other words, a diversion, although sufficient to prove intent, is not necessary.

13

¶24 Decisions from this Court have not consistently required diversions for water appropriations. Indeed, despite the fact that most traditional beneficial uses of water, such as mining and irrigation, could not occur without a diversion, Montana has specifically recognized appropriations of water without diversions where no diversion was required for the intended beneficial use. *See, e.g., Donich v. Johnson* (1926), 77 Mont. 229, 250 P. 963 (appropriation recognized for instream reservoir); *Axtell v. M.S. Consulting*, 1998 MT 64, 288 Mont. 150, 955 P.2d 1362 (domestic use recognized without a diversion). Those cases that do suggest that a diversion is an essential element of an appropriation involve uses that, of practical necessity, require a diversion for the application to beneficial use. *See, e.g., Warren v. Senecal* (1924), 71 Mont. 210, 220, 221 P. 71, 75 (diversion by ditch for use in mining and irrigation); *Sherlock v. Greaves* (1938), 106 Mont. 206, 216, 76 P.2d 87, 89 (diversion by pipes and flumes from ditch for irrigation and domestic use).

¶25 Justice Rice in his dissent states that, in recognizing instream uses prior to 1973, we are rewriting Montana history. Justice Rice's protestations to the contrary, Montana has a legendary history of cattle and sheep ranching. No doubt Montana's stockgrowers would be surprised to learn, as the dissent suggests, that Montana law would not have recognized a right to water stock directly from a stream, lake, pond or slough without a man-made diversion. Justice Rice's assertion that Montana law is "monolithic" and absolute in requiring a diversion as a prerequisite element for all pre-1973 water appropriation claims is belied by the fact the Montana Legislature recognized that pre-1973 claims for stock use and individual use *based upon instream flow* were valid. Such non-diversionary, instream

14

claims were exempted from the mandatory filing requirement of Title 85, Chapter 2. ("Every person . . . asserting a claim to an existing right to the use of water arising prior to July 1, 1973, is ordered to file a statement of claim to that right with the department no later than June 30, 1983. Claims for stock and individual as opposed to municipal domestic uses *based upon instream flow* or ground water sources are exempt from this requirement; however, claims for such uses may be voluntarily filed." Section 85-2-212, MCA (emphasis added)).

¶26    The fact that there are no Montana decisions establishing such an instream right merely reflects the fact that that issue was not litigated, not that such a right was beyond the pale of Montana prior appropriation doctrine. *See Wilhite v. Billings etc. Power Co.* (1909), 39 Mont. 1, 101 P. 168, in which Wilhite brought a nuisance action against the maintenance of a dam on the Yellowstone River which caused the river to overflow some of Wilhite's land making it "almost impossible for plaintiff to reach the river and water his livestock or to obtain water for household purposes . . . ." *Wilhite,* 39 Mont. at 4, 101 P. at 168. This Court affirmed the injunctive relief but remanded for a narrowing of the terms of the injunction. In *Bean Lake,* we acknowledged, "[i]t cannot be disputed . . . that there were beneficial uses for which appropriation rights could be obtained which would not require diversion of the  waters." 234 Mont. at 340, 766 P.2d at 233.  Given our history, there is every reason to believe that had the issue arisen, Montana would have followed the lead of Nevada and held that no ditch, dam reservoir or other artificial means was necessary for watering cattle.  If there must be a diversion with intent to apply water to a beneficial use,

15

then "the drinking by cattle constitutes a diversion, [and] the necessary intent must be that of the cattle." *Steptoe Live Stock Co. v. Gulley* (Nev. 1931), 295 P. 772, 775.

¶27 The non-recognition of instream uses prior to 1973 would likewise have been a shock to Montana's early loggers and railroaders who used Montana stream flows to float logs and railroad ties. *See Montana Coalition for Stream Access v. Curran* (1984), 210 Mont. 38, 44, 682 P.2d 163, 166, where we recognized that the Dearborn River was used in 1887, two years before Montana statehood, to float approximately 100,000 railroad ties. Then in 1888 and 1889, there were one or two log drives per year down the Dearborn thus satisfying the federal test for navigability for title purposes. The Court then proceeded to analyze whether public recreational use and fishing make a stream navigable for "use" as opposed to title. We quoted extensively from an 1893 decision from Minnesota which reasoned that navigability for use should not be limited to commercial usage. Rather, the concept must include noncommercial uses such as "boating and sailing for pleasure."

> Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for, commercial navigation; but they are used–and as population increases, and towns and cities are built up in their vicinity, will be still more used–by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated. To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated . . . .

*Lamprey v. State* (Metcalf) (Minn.1893), 53 N.W. 1139, 1143.

¶28 We also quoted from a Wyoming decision as to the public's use of state waters.

16

> Irrespective of the ownership of the bed or channel of waters, and irrespective of their navigability, the public has the right to use public waters of this State for floating usable craft and that use may not be interfered with or curtailed by any landowner. It is also the right of the public while so lawfully floating in the State's waters to lawfully hunt or fish or do any and all other things which are not otherwise made unlawful.

*Day v. Armstrong* (Wyo. 1961), 362 P.2d 137, 147, quoted in *Montana Coalition,* 210 Mont. at 51-52, 682 P.2d at 170.

¶29    Having noted with approval the Minnesota and Wyoming precedent, we quoted Article IX, Section 3(3), of the Montana Constitution, which states that all waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law. Relying on this constitutional provision and on the public trust doctrine dating back to statehood, the Court concluded that navigability for purposes of determining public "use" rights is determined by the capability of use of the water for recreational purposes.

> In sum, we hold that, under the public trust doctrine and the 1972 Montana Constitution, any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes.

*Montana Coalition*, 210 Mont. at 53, 682 P.2d at 171.

¶30    The dissent queries "how this 1984 decision, interpreting the 1972 Constitution could have established in-stream water rights for prior years." The dissent conveniently ignores the fact that the Court, in *Montana Coalition*, interpreted not only the 1972 Constitution, but also the public trust doctrine which dates back to Montana's statehood. Under the Constitution <u>and</u> the public trust doctrine, the public has an instream, non-diversionary right

17

to the recreational use of the State's navigable surface waters. This holding, of course, allays the concerns that the Court expressed in *Paradise Rainbows* where the Fish and Game Commission contended that the public had a prior right to the use of the stream since the public had used the creek as a fishing stream and natural fish hatchery. The Court stated that it could not yield to this contention since "[s]uch a public right has never been declared in the case law of this state." *Paradise Rainbows*, 148 Mont. at 419, 421 P.2d at 721. The Court in *Montana Coalition* filled that void and declared that the public does have a right to recreational use of the State's navigable waters.

¶31 The dissent quotes *Montana Coalition* as recognizing that landowner Curran had no right to control the use of the surface waters of the Dearborn River to the exclusion of the public, "except to the extent of his prior appropriation of part of the water for irrigation purposes . . . ." *Montana Coalition*, 210 Mont. at 52, 682 P.2d at 170. Justice Rice accuses the Court of ignoring the qualifying clause (quoted above). The referenced clause from *Montana Coalition* merely recognizes the principle of prior appropriation: that first in time is first in right. *Meine v. Ferris* (1952), 126 Mont. 210, 216, 247 P.2d 195, 198; § 85-2-401, MCA. In adjudicating individual claims for pre-1973 recreation, fish and wildlife, the Water Court will have to determine the validity of each claim, and as to those claims it finds valid, it will have to assign a priority date. Section 85-2-234(6)(c), MCA.

¶32 Ample case law depicting the evolution of the prior appropriation doctrine, and emerging from throughout the west, supports a conclusion that the doctrine should not rigidly demand a diversion where unnecessary to achieve the intended beneficial use. *See, e.g.,*

18

*Empire Water & Power Co. v. Cascade Town Co.* (8th Cir. 1913), 205 F. 123, 129 ("[i]f nature accomplishes a result which is recognized and utilized, a change of process by man would seem unnecessary"); *In re Water Rights in Silvies River* (Or. 1925), 237 P. 322, 336 "[w]hen no 'ditch, canal, or other structure' is necessary to divert the water from its natural channel, the law does not vainly require such works, prior to an appropriation"); *Town of Genoa v. Westfall* (Colo. 1960), 349 P.2d 370, 378 ("It is not necessary in every case for an appropriator of water to construct ditches or artificial ways through which the water might be taken from the stream in order that a valid appropriation be made. The only indispensable requirements are that the appropriator intends to use the waters for a beneficial purpose and actually applies them to that use"); *State, Dept. of Parks v. Idaho Dept. of Water Admin.* (Idaho 1974), 530 P.2d 924, 933 (Bakes, J., concurring) ("[w]here an appropriative water right does not require a diversion to make it effective and beneficial, in the absence of a statute requiring a diversion there appears to be no practical reason why a diversion should be required").

¶33 The issue of whether Montana recognizes instream water rights prior to 1973 was again addressed by this Court in *State ex rel. Greely v. Confederated Salish and Kootenai* (1985), 219 Mont. 76, 712 P.2d 754. In *Greely*, the issue was whether Montana's Water Use Act was adequate to adjudicate federal and Indian reserved water rights which pre-dated 1973. Addressing Indian water rights, we noted that Montana's Water Use Act permits the Water Court to treat Indian reserved rights differently from state appropriated rights in terms

19

of the filing of claims and contents of preliminary and final decrees.[3] We then noted that the Act recognizes and confirms "existing rights to the use of any waters for any useful or beneficial purpose." Section 85-2-101(4), MCA. "Existing right" means a right to the use of water which would be protected under the law as it existed prior to July 1, 1973. Section 85-2-102(8), MCA. Since the Court in *Greely* recognized that state appropriative water rights and Indian reserved water rights differ in origin and definition and that Indian rights are governed by federal law (*Greely*, 219 Mont. at 89, 712 P.2d at 762; *accord, Application for Beneficial Water Use Permit* (1996), 278 Mont. 50, 56-57, 923 P.2d 1073, 1077), the Court could have concluded that the State of Montana was bound to recognize Indian reserved rights as "existing rights" which would be protected under the law (federal law) as it existed prior to July 1, 1973. Section 85-2-102(8), MCA. However, rather than rely on a federal definition of Indian reserved rights, the *Greely* Court then set out the Water Use Act definition of "beneficial use," that is, "use of water for the benefit of the appropriator, other persons, or the public, including but not limited to agricultural (including stock water), domestic, fish and wildlife, industrial, irrigation, mining, municipal, power and recreational uses." Section 85-2-102(2), MCA. Having thus set out the various state statutory premises,

---

[3] *See, e.g.*, § 85-2-224, MCA (statement of claim for federal reserved water rights); § 85-2-234(2), MCA (terms of negotiated Indian water rights compact must be included in final decree without alteration); § 85-2-234(3), MCA (final decree must establish existing rights and priorities of Indian tribe possessing water rights arising under federal law); and §§ 85-2-701 through -705, MCA (establishing reserved water rights compact commission to negotiate with Indian tribes to quantify Indian reserved water rights).

20

the Court then concluded: "This definition recognizes nonconsumptive and instream uses for fish and wildlife. It is sufficiently broad to allow adjudication of water reserved to protect tribal hunting and fishing rights, including protection from the depletion of streams below a protected protection level." *Greely*, 219 Mont. at 91, 712 P.2d at 763. This holding is significant in that in relies, not on federal law, but on the Montana Water Use Act's very broad definition of "beneficial use" as the basis for recognizing pre-1973 tribal rights to non-consumptive and instream uses as "existing rights" which must be confirmed under the Act. The Court thus concluded that the Water Use Act, on its face, is adequate to adjudicate Indian reserved water rights, including claims for instream uses prior to 1973. In effect, the Court, in determining what constitutes an "existing use," incorporated the Water Use Act's broad definition of "beneficial use," thereby making that definition applicable to both post and pre-1973 water rights claims. Using the same statutory definition for "beneficial use" as cited in *Greely* (a definition applicable to all water users, not just tribes), there is no reason why the Water Court cannot adjudicate both tribal and non-tribal claims for instream uses prior to 1973.

¶34 Three years after *Greely*, we decided *Bean Lake*. We note that in *Bean Lake*, the DFWP, although it did not prevail, argued in its brief against making an artificial distinction between diverted and non-diverted rights for fish, wildlife and recreation purposes.

> First, such a requirement would be an anachronism. While the diversion requirement is appropriate where diversion is the only means by which water can be used, it makes no sense to blindly require a diversion where a beneficial use can and must be made in the stream or lake.

21

. . . .

> As an illustration of the inapplicability of a diversion requirement to the recreational and fish and wildlife use of Bean Lake, imagine a natural or manmade depression located close to the lake and of the same size and shape as Bean Lake. Further assume that all of the water of Bean Lake is diverted by pumping into this depression and the new "lake" is stocked and managed as a fishery and a recreational resource. The artificial lake is unlikely to be either as productive or as aesthetically pleasing as the natural lake. However, if a diversion is an absolute requirement for an appropriation, then the less desirable and much more expensive artificial lake would be given preference in law over the use of the natural lake. Such a conclusion would be, at the very least, a disservice to logic.

¶35 Only two short months after our *Bean Lake* decision, the Nevada Supreme Court decided a nearly identical controversy. In *State v. Morros*, the Nevada Court considered whether "Nevada law absolutely requires a physical diversion of water to obtain a water right" in a controversy involving an inlake appropriation claim for recreation purposes. *State v. Morros* (Nev. 1988), 766 P.2d 263, 265. After noting that the common law had evolved to allow appropriations for stock watering without a diversion when there was no practical need for a physical diversion, the Nevada Court validated an inlake appropriation for recreation purposes. *Morros*, 766 P.2d at 267. In protecting the inlake water right, the court held that just as the common law "conformed to the practical demands of stockwatering," so should it reflect the fact that "[d]iversions are not needed for and are incompatible with many recreational uses." *Morros*, 766 P.2d at 267. We find the Nevada Court's reasoning persuasive.

¶36 Any perception that Montana law required a diversion as a *sine qua non* to an appropriation arises from the fact that most traditional uses, such as agriculture and mining,

22

had a practical need for a physical diversion. That necessity combined with the practice of using diversions as evidence of a user's intent to appropriate has undeniably led to confusion in our precedent, which likewise recognizes instream uses of water where no diversion is necessary for the beneficial use. *See, e.g., Axtell v. M.S. Consulting*, 1998 MT 64, 288 Mont. 150, 955 P.2d 1362; *Donich v. Johnson* (1926), 77 Mont. 229, 250 P. 963; *Montana Coalition*, 210 Mont. at 44, 682 P.2d at 166; and *Greely*, 219 Mont. at 91, 712 P.2d at 763. Given Montana's long history of beneficially using water for purposes of agriculture, mining, cattle and sheep ranching, logging, railroading, fishing and recreation, we resolve the confusion in favor of the *Axtell, Doney, Montana Coalition* and *Greely* line of authority and hold that the doctrine of prior appropriation does not require a physical diversion of water where no diversion is necessary to put the water to a beneficial use. Thus, instream/inlake appropriations of water for beneficial uses may be valid when the purpose (e.g., stock-watering, fish, wildlife and recreation) does not require a diversion.

¶37 Because beneficial use rather than diversion is the touchstone of the prior appropriation doctrine; because Montana has long recognized as beneficial the use of water for fish, wildlife and recreation; and because Montana has validated non-diversionary appropriations, we now hold that Montana law prior to 1973 did not absolutely require a diversion for a valid appropriation of water.

¶38 Finally, we note that the *Bean Lake* Court's conclusion that the framers of the Montana Constitution did not accept fish, wildlife and recreation uses as a valid basis for appropriative water rights does not accurately reflect the substance of the debates reflected

23

in the transcripts of the Constitutional Convention. The Court seems to have based its conclusion on the fact that, after debate, Subsection 4 to Article IX, Section 3, was deleted. Proposed Subsection 4 read as follows:

> Subsection 4. Beneficial uses include but are not limited to domestic, municipal, agriculture, stockwatering, industry, recreation, scenic waterways, and habitat for wildlife, and all other uses presently recognized by the law together with future beneficial uses as determined by the Legislature or courts of Montana. A diversion or development is not required for future acquisition of a water right for the foregoing uses. The Legislature shall determine a method of establishing those future water rights which do not require a diversion and may designate priorities for those future rights if necessary.

¶39 A thorough review of the transcripts reveals the rationale for the deletion. After Delegate Wilson proposed an amendment that would make non-diversionary rights permanently junior to diversionary rights regardless of the date of appropriation, the delegates voted to delete the entire section. Several delegates urged the deletion of the section to avoid the eternal subordination of instream rights to diversionary agricultural and industrial rights. Delegate Arbanas explained, "I sense that the time may come in Montana when recreation may be our big industry. . . . To say forever that agriculture or industry will come ahead of–seems to me something I don't want in the Constitution." Verbatim Transcript Vol. V, at 1332. Delegate Reichert similarly expressed her concerns: "If we pass this . . . is there a danger of having these other amendments tacked on to it? Perhaps I'd be better off, since I'm for recreation as a beneficial use–perhaps we are all better off to delete the entire section." Verbatim Transcript at 1341. The transcripts indicate that it was the fear of future limitations on fish, wildlife and recreation rights that led to the deletion of the entire

24

section, rather than a belief that such rights had not already been recognized. Thus the *Bean Lake* Court mistakenly relied on the deletion of Subsection 4 in concluding that the framers of the Constitution did not intend to recognize appropriations rights existed for fish, wildlife and recreation uses.

¶40 For the foregoing reasons, we overrule the *Bean Lake* conclusion that Montana, prior to 1973, did not recognize fish, wildlife and recreation appropriations of water, whether diversionary or non-diversionary. We hold that Montana recognized fish, wildlife and recreation uses as beneficial and that valid instream and inlake appropriations of water existed in Montana prior to 1973 where the intended beneficial use did not require diversion, and when the facts and circumstances indicate that notice of the appropriator's intent had been given.

¶41 In its brief to this Court, the Water Court requested that, if this Court revisits the *Bean Lake* decision, we give the Water Court "clear instructions" on how to proceed with regard to recreation, fish and wildlife claims. Accordingly, the Water Court is instructed to identify, review and hold hearings in a manner similar to *Adjudication of Water Rights of Yellowstone River* (1992), 253 Mont. 167, 832 P.2d 1210, on all pre-1973 recreation, fish and wildlife claims, both diversionary and non-diversionary, and determine the validity of such claims under the holding herein.

¶42 A final note about Justice Rice's dissentient incantations that the Court has, in addressing non-diversionary rights, gone outside the pleadings and outside the issues. Far

25

from being outside the issues, non-diversionary rights are at the heart of the dispute. They are the very source of the confusion that we are asked to resolve.

¶43 The *Bean Lake* decision which has engendered all the confusion arose out of claim for inlake, non-diversionary water rights for fish, wildlife and recreation purposes in a natural pothole. That decision then gave rise to the Water Court's *Bean Lake* remark which, in turn, has been applied to both diversionary and non-diversionary rights. Since the *Bean Lake* decisions in 1988 and 1989, the Water Court has (as of May 9, 2000) issued *Bean Lake* remarks in 1666 claims in 38 basins. It makes little sense to prolong the confusion by stopping the legal analysis midstream, as the dissent would have us do.

¶44 If *Bean Lake* needs clarification, as all agree it does, then we must, of necessity, address both diversionary and non-diversionary uses. If we were to embrace Justice Rice's simplified rendition of Montana's water usage history (ignoring non-diversionary uses for logging, stockwatering, railroading and recreation), we would be writing fiction rather than engaging in legal analysis.

> II    Does the Water Court's use of the "*Bean Lake* remark" violate the Supreme Court's Water Right Claim Examination Rules 5.II and 5.IV(1)(a)?

¶45 DFWP argues that the remark highlighting the ambiguity in Montana precedent is a "policy" instituted by the Water Court that violates the Claims Examination Rules promulgated by this Court. We find that the Montana Water Court has the authority to include relevant potential issue remarks in its rulings, and that the *Bean Lake* remark is such an issue remark.

26

¶46 While not challenging the Water Court's authority to insert issue remarks, DFWP suggests that the consistent insertion of the *Bean Lake* remark in all fish, wildlife and recreation claims indicates that the Water Court has adopted a position on the substantive issue. The Water Court on the other hand states that the remark merely identifies potential issues as authorized by various Claims Examination Rules. *See, e.g.,* Rules 2.I(5)(b), 3.II(5)(b), and 4.III(3)(b).

¶47 We agree with the Water Court that the *Bean Lake* remark simply notes a potential legal issue. The remark does not take a position and does not rule on any issue but merely highlights the conflict engendered by *Bean Lake*. Rather than instituting any "policy," the remark simply points out the possibility that *Bean Lake* could provide a basis for a challenge to any pre-1973 fish, wildlife and recreation water claim. The remark was therefore an appropriate exercise of the Water Court's discretion and did not violate our Claims Examination Rules.

_____
Justice

We concur:

_____

_____

_____
Justices

27

Justice Jim Rice concurring in part and dissenting in part.

¶48    The public right urged by the Commission would be based on the fact that the public had used the creek as a fishing stream and natural fish hatchery before DuPuy built his dam. . . . Such a public right has never been declared in the case law of this state.

*Paradise Rainbows v. Fish and Game Commission* (1966), 148 Mont. 412, 419, 421 P.2d 717, 721.

¶49    In this appeal, the DFWP is asserting a pre-1973 water right claim for fish, wildlife and recreation purposes for appropriations involving a diversion or capture of water. Although the Court's rationale in *Bean Lake* properly recognized that recreational uses may constitute a beneficial use for purposes of applying the prior appropriation doctrine, the opinion unfortunately concluded that no appropriation right for recreational uses of any kind was recognized prior to 1973, except for those contemplated under the Murphy rights statute. That conclusion appeared to invalidate pre-1973 recreational claims which satisfied all of the elements of the appropriation doctrine, including the element of diversion.

¶50    I concur with the Court's holding herein that recreational use is a beneficial use of water, and that the language in *Bean Lake* which purports to invalidate all pre-1973 recreational claims is erroneous. To the extent that it is necessary to clarify that pre-1973 recreational claims which meet all of the elements of the appropriation doctrine, including diversion, are valid, I concur with the Court's decision herein. However, I must dissent from the remaining, substantial portion of the Court's opinion. *Bean Lake* properly held that pre-

28

1973 claims involving "non-captive," i.e., instream or inlake, recreational uses have never been recognized, as also acknowledged by this Court in *Paradise Rainbows*.

¶51 The Court offers a lengthy discussion in an effort to market its conclusions that the doctrine of prior appropriation is a "historically flexible" concept, and that the strict necessity of establishing diversion is mere "perception." The Court further holds that the doctrine recognizes appropriations of water without a diversion whenever a diversion is not necessary for the use. Finally, the Court holds that pre-1973 instream appropriations have already been recognized and approved in our law. These conclusions, which blatantly ignore controlling statutes and case law, are all erroneous. A proper review of the applicable law establishes that diversion, or a form thereof, such as impoundment or capture, is a longstanding, foundational and requisite element for all pre-1973 water appropriation claims, including recreational uses. That the law clearly required it is an inescapable conclusion.

¶52 A brief look at our early history and precedent is necessary to accurately determine the applicable law on these issues.

¶53 This Court provided a detailed recounting of the early law of water appropriation in *Bailey v. Tintinger* (1912), 45 Mont. 154, 122 P. 575. The Court noted the law had its origins in the customs of miners and others in California, and that those customs ripened into well-recognized rules long before the development of local government and legislation. "These customs formed a part of our unwritten law, or, as it might more aptly be termed, the

29

common law of this country as distinguished from the common law of England." *Bailey*, 45 Mont. at 166, 122 P. at 579.

¶54 This pre-statutory common law of appropriation, often referred to in our case law as the "settlers' customs," was summarized by the Court in *Murray v. Tingley* (1897), 20 Mont. 260, 50 P. 723, as follows: "A person acquired a right to use the water by digging a ditch, tapping a stream, and turning water into it, and applying the water so diverted to a beneficial use. This constituted a valid appropriation of water." *Murray*, 20 Mont. at 268, 50 P. at 725. Consequently, the Court reaffirmed therein that "[t]he essence of an appropriation [is] a completed ditch, actually diverting water, and putting it to a beneficial use . . . ." *Murray*, 20 Mont. at 269, 50 P. at 725. These common law requirements were repeatedly emphasized in our early case law and throughout our history.

¶55 Even at this early juncture in the discussion, the flaws in the Court's analysis begin to appear. The Court holds that "beneficial use is the test of a valid right" and "beneficial use rather than diversion is the touchstone of the prior appropriation doctrine," but fails to acknowledge that diversion has always been an inherent requirement in our law's assessment of whether water was beneficially used. As noted in the above quotations from *Bailey* and *Murray*, beneficial use has always been a separate, and additional, consideration which followed capture of the water itself. *See also Wheat v. Cameron* (1922), 64 Mont. 494, 501, 210 P. 761, 763 ("[a]ctual diversion and beneficial use existing or in contemplation constitute

30

an appropriation"). The Court further explained the difference between these two considerations in *Toohey v. Campbell* (1900), 24 Mont. 13, 60 P. 396, holding:

> that right to the use of water is a possessory one, that may be obtained by actual appropriation and diversion, perfected by application of the water so appropriated to a beneficial use then present and contemplated.

*Toohey*, 24 Mont. at 17, 60 P. at 397. After explaining that the requirement of beneficial use "perfected" a diversion-based appropriation, the Court further explained the process of determining beneficial use, which underscores another error in the Court's opinion herein:

> But, as every appropriation must be made for a beneficial or useful purpose . . . it becomes the duty of the courts to try the question of the claimant's intent by his acts and the circumstances surrounding his possession of the water, its actual or contemplated use and the purposes thereof.

*Toohey*, 24 Mont. at 18, 60 P. at 397. Contrary to the Court's holding herein at ¶ 23, proof of intent is not, and has never been, a substitute for diversion. Rather, as the Court has previously explained, a claimant's intent was analyzed to determine whether a beneficial use was contemplated, the amount of water appropriated, or if the right had been lost by abandonment of its beneficial use. In erroneously holding otherwise, the Court misapprehends *Wheat v. Cameron*, and cites it for the wrong proposition at ¶ 22. The *Wheat* Court, in holding that a claimant's intent could be established "by his act and by surrounding circumstances, its actual and contemplated use, and the purpose thereof," never wavered from also requiring "actual diversion," in addition to intent. *Wheat*, 64 Mont. at 501, 201 P. at 762. Further, as we have clearly held, "[a]ctual use was not a prerequisite to the creation of the right . . . actual diversion was enough, *if with bona fide intent*." *Bailey*, 45 Mont. at

31

173, 122 P. at 582 (emphasis added), quoting Wiel on Water Rights. The intent, of course, was not an intent to divert, but an intent to use the water beneficially.

¶56 This Court has explained that the concept of beneficial use developed in the law after the diversion requirement was already established. *See In re Adjudication of Water Rights of Clark Fork River* (1992), 254 Mont. 11, 15, 833 P.2d 1120, 1123. The concepts were then used together to define the extent of the right: "Water rights have therefore been limited to the amount of water actually put to a beneficial use, despite the amount of water diverted or claimed under a notice of appropriation." *79 Ranch v. Pitsch* (1983), 204 Mont. 426, 432, 666 P.2d 215, 218.

¶57 Even before statehood, the demands on water prompted the Montana Territorial Legislature to enact statutes governing the appropriation process. Legislation was first enacted in 1870 and revised in 1877. These provisions recognized water rights "acquired or to be acquired under the rules and customs of the early settlers," and did not attempt to prescribe any other method of securing water rights. *Bailey*, 45 Mont. at 166, 122 P. at 579. However, such an effort was undertaken by the enactment of "An Act relating to Water Rights" in 1885, legislation which this Court declared had ushered in a new era in water appropriation law. Commenting thereon, this Court stated:

> [T]here are, then, two distinct periods in the history of our water right law. The first comprises the time from the earliest settlement to 1885, during which period the rights were determined exclusively by the rules and customs of the settlers; and the second extends from 1885 to the present time.

32

*Bailey*, 45 Mont. at 167, 122 P. at 579. The *Bailey* Court extensively analyzed the legislation, finding that the Legislature's "purpose was to prescribe the [five] steps necessary to be taken to effect a complete appropriation of water," including: (1) posting notice, (2) filing notice with the county clerk and recorder, (3) commencing work within forty days of posting notice, (4) prosecuting the work with reasonable diligence, and (5) actual completion of the diversionary works. *Bailey*, 45 Mont. at 170, 173, 122 P. at 580, 581. The Court emphasized the requirement of diversion under the statute, and, consistent with its explanation of beneficial use in *Toohey*, held that beneficial use could be established as a future intent, rather than concurrently established at the time of diversion:

> [T]he claimant who proceeds under the statute, and performs the acts required as set forth above, has a completed appropriation of water upon the completion of the work on his ditch, canal, or other means of diversion, even before the water is actually applied to beneficial use.

*Bailey*, 45 Mont. at 174, 122 P. at 582. The Court concluded that, following passage of the landmark legislation, water could be appropriated in two ways, either by way of the Act, or by the elements of the common law as existed prior to the 1885 enactment, but that both methods required a diversion or possession of water. *Bailey*, 45 Mont. at 174, 122 P. at 582.

¶58 That remained the law in Montana over the next century. Since 1885, Montana has had virtually the same statutory provisions governing water appropriation, and has continued to recognize diversion-based common law claims. The two methods, common law and statute, both requiring diversion, remained the only alternatives for securing an appropriation of water. As we explained in *Shammel v. Vogl* (1964), 144 Mont. 354, 396 P.2d 103:

33

> On March 12, 1885, the statutory appropriation act was passed in Montana. Since 1885, two distinct methods of appropriating water exist. One is by complying with the rules and customs of the early settlers; consisting of actual appropriation and application to a beneficial use. The other is by complying with the terms of the statutes passed pursuant to the 1885 Act.

*Shammel*, 144 Mont. at 367, 396 P.2d at 110. This Court further held that the requirements of the appropriation statute will be "strictly construed," and that a notice of appropriation thereunder is "fatally defective" to the claimed water right if it does not conform to statutory requirements. *Holmstrom Land Company v. Meagher County* (1979), 185 Mont. 409, 427, 605 P.2d 1060, 1070; *Shammel*, 144 Mont. at 369, 396 P.2d at 111.

¶59 The statutory scheme required that a notice of appropriation contain the following information, with the focus on diversion:

> The quantity of water claimed designated in cubic feet or miner's inches; the purpose for which the water is claimed and the place of intended use; *the means of diversion*, including size of ditch, etc., by which *diversion* will be made; the date of appropriation; the name of the appropriator; the name or description of the stream from which *diversion* is made; an accurate description of the *point of diversion*, with reference to some natural object or permanent monument; and, finally, the notice is to be verified by the affidavit of the appropriator or someone in his behalf, which affidavit must state that the matters and facts contained in the notice are true.

Section 89-810, R.C.M. (1947) (emphasis added).

¶60 In *DNRC v. Intake Water Company* (1976), 171 Mont. 416, 558 P.2d 1110, the Court analyzed the requirements for establishing a valid appropriation under the statutes. After setting forth the five statutory requirements enumerated above, the Court commented as follows:

34

> Completion of all these steps is necessary to a complete appropriation [citation omitted]. *A declaration of appropriation, unaccompanied by construction of a diversion works and actual diversion of the water, is insufficient* [citation omitted]. Thus the posting and filing of the notice of appropriation is a condition precedent to a valid appropriation, and *a valid appropriation does not exist without completion of the work and actual diversion of the water.*

*Intake*, 171 Mont. at 430, 558 P.2d at 1118 (emphasis added). The *Intake* Court could not have been more clear, holding that (1) declaration of one's intent to appropriate, without a diversion, does not establish a valid water right; and (2) a statutory appropriation is not valid without a diversion.

¶61 In reaching its conclusions today, the Court in large part ignores our century-old statutory scheme requiring diversion[1], preferring instead to focus on our common law history.

---

[1] After ignoring the enduring history of these legislative enactments, and the repeated interpretation and application of the law by generations of Montana judges, the Court seizes upon the 1979 enactment of § 85-2-212, MCA, as evidence of the Legislature's recognition of pre-1973 nondiversionary rights. The Court apparently concludes therefrom that these nondiversionary rights were superior to other water claims in that filing a claim was not even mandatory. At any rate, the Court has sorely misinterpreted this statute.

First, although this claim statute allowed voluntary filing of certain non-recreational instream claims, all claims were nonetheless required to prove "the place and means of diversion" in order to successfully establish the water right, § 85-2-234(6), MCA, and there was nothing inconsistent about this requirement. The statute, by its definition of "appropriation" (quoted herein), limited "instream" claims to those which were based upon "diversion, impoundment or withdrawal." Section 85-2-102(1), MCA. Instream stock claims were deemed to be based upon withdrawal. Second, claims allowed under this statute were restricted to those with "existing rights," which were defined by the statute as a water right "protected under the law as it existed prior to 1973." Section 85-2-102(10), MCA. As demonstrated herein, no pre-1973 law protected instream recreational claims. Third, while the statute's definition of "beneficial use" included recreational uses, the definition of "appropriation" nonetheless required those claims to be based upon diversion: "'Appropriate' means . . . (a) *to divert, impound, or withdraw* (including by stock for stock water) a quantity of water." Section 85-2-101(1)(a), MCA (emphasis added). In the case of the

35

The Court finds that "the appropriation doctrine's history of flexibility and practicality support a holding that a diversion is not required," and that "beneficial use is the only essential element of a valid appropriation." Finally, the Court concludes that "intent is the essential element and may be proven through means other than diversion." In so holding, the Court refuses to honor our common law.

¶62    In *Shammel v. Vogl, supra,* after the Court concluded that the claimant's right could not be established under the appropriation statutes, it analyzed her claim under the common law:

> If the [claimant's] water right exists, it will have to be shown as a water right acquired prior to the 1885 Act and without benefit of that Act. The essential features of an appropriation of water made prior to the 1885 Act are a completed ditch and actual appropriation and application of an amount of water to a beneficial use.

*Shammel*, 144 Mont. at 369, 396 P.2d at 111. The Court then found that the claimant's failure to provide evidence of diversion was fatal, and affirmed the district court's refusal to recognize the claim. This has been the unwavering position of the Court in regard to common law (non-statutory) water appropriations for a century. *See Midkiff v. Kincheloe* (1953), 127 Mont. 324, 328, 263 P.2d 976, 978 ("[t]he rule is that he who first diverts the

---

Department of Fish, Wildlife and Parks, the Petitioner here, appropriation was limited to leasing water under legislation adopted in 1989. Section 85-2-101(1)(c), MCA. Clearly, this 1979 claim statute did not alter the state of pre-1973 law, and the Court cannot point to any authority for such a conclusion. The Court also fails to explain how this statute's provision for voluntary filing of diversion or withdrawal-based stock and individual claims recognizes non-diversionary recreational claims.

36

water to a beneficial use has the prior right thereto where the right is based upon the custom and practice of the early settlers as here, and where there was no compliance with the statute"); *Clausen v. Armington* (1949), 123 Mont. 1, 212 P.2d 440 ("a person may make a valid appropriation of water by actual diversion and use thereof without filing a notice of appropriation as defined in sections 7100 to 7102, R. C. M. 1935"); *Vidal v. Kensler* (1935), 100 Mont. 592, 51 P.2d 235 ("a valid appropriation of water may be acquired even where there has been no compliance with the statute regulating appropriations by record, where the water is actually diverted from the stream and applied to a beneficial use; compliance is important only with regard to the doctrine of 'relation back'"); *Maynard v. Watkins* (1918), 55 Mont. 54, 173 P. 551 ("[t]he essential elements of an appropriation were a completed ditch and the application of water through it to a beneficial use").

¶63 Despite the heavy weight of our precedent, the majority finds that diversion was not a part of this Court's "traditional appropriation analysis," and that "[d]ecisions from this Court have not consistently required diversions for water appropriations." The cases cited for this supposed "inconsistency" are *Donich v. Johnson* (1926), 77 Mont. 229, 250 P. 963, and *Axtell v. M.S. Consulting,* 1998 MT 64, 288 Mont. 150, 955 P.2d 1362. However, neither stand for the proposition for which they are offered.

¶64 The issue in *Donich* was whether junior appropriators were infringing upon the water rights of senior appropriators, who claimed that the damming and storing of water by the junior rightholders was infringing upon their senior rights established under a previous

37

adjudication. *Donich* dealt with the priority of rights between appropriators, not whether the junior appropriators' actions fulfilled appropriation requirements. The existence of diversion was not an issue in the case, because diversion was acknowledged therein. The *Donich* Court stated that the actions of the junior appropriators constituted "diverting water," and approved the junior appropriators' capture and storage of the water for irrigation purposes:

> The construction and maintenance of secure reservoirs for the conservation of these waters, therefore, is of very high public importance. . . . The right to condemn land for a reservoir for the storing of water was declared in *Helena Power Transmission Co.* [citation omitted]. The right to impound and store water has been recognized repeatedly in other [Montana] opinions [citations omitted]. Indeed, the practice of impounding water in reservoirs has obtained in this state from the earliest days.

*Donich*, 77 Mont. at 239-40, 250 P. at 965. In supporting this kind of diversion, the Court stated that the use was permissible because "water appropriated may be turned into the channel of another stream, or from a reservoir into a stream and mingled with its waters and then reclaimed." *Donich*, 77 Mont. at 240, 250 P. at 966. Although diversion was not an issue therein, *Donich* clearly approved of the physical capture of water as the equivalent of diversion.

¶65    The Court then offers our 1998 decision in *Axtell* as an example of a common law non-diversion appropriation we have previously approved. As in *Donich*, *Axtell* did not address the necessity for diversion, but instead decided whether ownership of an existing right had passed to a successor in interest. The Court specifically stated that it was not addressing the "method of appropriation." *Axtell*, ¶ 31. However, to the extent the issue can

38

be analogized, it supports the diversion requirement. The Court first summarized pre-1973 water law in Montana, stating that:

> As previously stated, under the common law doctrine of prior appropriation, a person could acquire an exclusive right to use a specific amount of water by applying it to the land for a beneficial use. *"Appropriate" means to "divert, impound, or withdraw . . . a quantity of water."*

*Axtell*, ¶ 26 (emphasis added). In retracing the history of the water right in question, the *Axtell* Court found that the original rightholder would "pack water from the spring to her home for her domestic needs." *Axtell*, ¶ 31. This "packing" of water, while not a diversion of the manner we normally think, is yet an equivalent physical capture which properly established the water right. *Axtell* thus rebels at the proposition for which it is offered.

¶66 Despite the capture of water involved in *Donich* and *Axtell*, and the recognition of diversion therein, the Court concludes from these two cases that "Montana has specifically recognized appropriations of water without diversions."

¶67 Clearly, the Court is remaking the law, but more than that, it is rewriting history. Its holding does not simply pronounce a rule of law for future application. Rather, the holding declares the state of the law prior to 1973–that instream, non-diversion rights were then recognized. If that assessment of the law is correct, the Court should be able to cite to a Montana case which approved of such a pre-1973 right, but, of course, it is unable to do so. The only two cases which recognized pre-1973 recreational claims, *Osnes Livestock Co. v. Warren* (1936), 103 Mont. 284, 62 P.2d 206, and *Paradise Rainbows v. Fish and Game Comm'n* (1966), 148 Mont. 412, 421 P.2d 717, were based upon diversion. There are no

39

other cases in our history to which the Court can cite in support of recreational claims—and certainly none which established a recreational right without diversion. In fact, every Montana case cited in the opinion stands precisely for the opposite conclusion than the one reached by the Court here.

¶68 The Court attempts to divert attention from the obvious lack of support in our precedent for its analysis by denouncing this dissent as a "simplified rendition of Montana's water usage history." If the Court deems this discussion of our law simplified, the objection lies not with the dissent, but with the law. Indeed, this Court has previously acknowledged the truth of the dissent's central premise: "Such a public right has never been declared in the case law of this state." *Paradise Rainbows*, 148 Mont. at 419, 421 P.2d at 721. While the Court claims to disdain fiction within legal analysis, its inability to point to a single Montana case supporting its position belies its asserted literary preference.

¶69 The Court also responds to this criticism by stating that stockgrowers, loggers, and railroaders would be surprised to learn that the diversion requirement would have affected their water use, and that the Court "would have" approved of such uses, had it been given the opportunity. While I have not suggested, as the opinion states, that Montana law would not have recognized the withdrawal of water by stock as a water right, I respectfully suggest that it is our duty to apply the law as it exists, not the law that "might have been," in seeking to explain the correct status of the law prior to 1973.

40

¶70 In an attempt to shore up its holding, the Court asserts that pre-1973 instream rights were recognized under the Public Trust Doctrine explained in *Montana Coalition for Stream Access v. Curran*. The Court fails to explain how *Montana Coalition* could have retroactively altered pre-1973 water law, noting simply that it magically "fills the void." While it is undisputed that the public trust doctrine has long existed in our precedent,[2] the point missed is that the doctrine had never been interpreted or understood in our history as establishing an instream, non-diversionary right, because such an interpretation was inherently inconsistent with the known law of appropriation in Montana. *Montana Coalition*, while not directly addressing appropriative rights, did help to change the understanding of the public trust doctrine in 1984. *Montana Coalition* did not, however, change water law as it had existed prior to 1973. That is probably why *none* of the many parties who have

---

[2]The Court reviewed these principles long before the 1972 Constitution was adopted. In *Prentice v. McKay* (1909), 38 Mont. 114, 98 P. 1081, we held that "the use of water is declared by the Constitution of this state . . . to be a public use," 38 Mont. at 117, 98 P. at 1083, citing Article III, Section 15, of the 1889 Constitution, and we again acknowledged this principle in *Bailey,* 45 Mont. at 175, 122 P. at 582. However, citing both federal and state statutes, the *Prentice* Court explained that, nonetheless, both "[t]he United States and the state of Montana have recognized the right of an individual to acquire the use of water by appropriation," and have established procedures for doing so. *Prentice*, 38 Mont. at 117, 98 P. at 1083. These principles, adopted under the 1889 Constitution, were then incorporated into the 1972 Constitution, as specifically held by this Court in *General Agriculture v. Moore* (1975), 166 Mont. 510, 534 P.2d 859 ("[w]e construe Article IX, Section 3(1) of the 1972 Constitution as not only reaffirming the public policy of the 1889 Constitution but also as recognizing and confirming all [water] rights acquired under that Constitution and the implementing statutes thereunder").

41

appeared before the Court even cited *Montana Coalition* in its briefs. *Montana Coalition* simply did not do what the Court reads into it.

¶71    Complicating its error, the Court ignores a critical part *of Montana Coalition*. After the Court in *Montana Coalition* pronounced the general principle that "[t]he Constitution and the public trust doctrine do not permit a private party to interfere with the public's right to recreational use of the surface of the State's waters," it clarified that principle in regard to the party at issue: "Curran has no right to control the use of the surface waters of the Dearborn to the exclusion of the public *except to the extent of his prior appropriation of part of the water for irrigation purposes. . .*" *Montana Coalition*, 210 Mont. at 52, 682 P.2d at 170 (emphasis added).

¶72    The Court somehow overlooks that *Montana Coalition* held that, although Curran had no right to ownership of the riverbed or surface waters, his prior diversion-based irrigation right was superior to the public's right, and he could properly restrict the public's use to that extent. In its expansive re-write of pre-1973 water law, and its order for the Water Court to review all pre-1973 recreational, fish and wildlife claims, the Court apparently does not deem this part of the *Montana Coalition* holding significant enough to mention or to include in its instruction to the Water Court.

¶73    The Court then turns to *State ex rel. Greely v. Confederated Salish and Kootenai* to justify its recognition of pre-1973 instream rights, but misapplies that case. Although the *Greely* Court held that reserved federal and tribal rights could be adjudicated by the Water

42

Court pursuant to the Montana Water Use Act, the substance of the opinion addresses the difficulties of so doing, given the considerable differences between reserved and state water rights.

¶74 The *Greely* Court acknowledged that "[t]he doctrine of reserved water rights conflicts with prior appropriation principles in several respects." *Greely*, 219 Mont. at 90, 712 P.2d at 762. The Court explained that state water rights were apportioned on the basis of use, prioritized by time, defined by a specified quantity of water, required an actual, beneficial use of the water, and required that "an appropriator of a state-created right must divert, impound or withdraw water to appropriate." *Greely*, 219 Mont. at 89, 712 P.2d 762.

¶75 The Court further explained that reserved rights were substantially different, in large part because, unlike state water rights, they were not based on use of the water. Rather, they were based upon the purposes of the reservation:

> Appropriative rights are based on actual use. *Appropriation for beneficial use is governed by state law. Reserved water rights are established by reference to the purposes of the reservation rather than to actual, present use of the water.* The basis for an Indian reserved water right is the treaty, federal statute or executive order setting aside the reservation. Treaty interpretation and statutory construction are governed by federal Indian law.

*Greely*, 219 Mont. at 90, 712 P.2d at 762 (emphasis added). In assessing whether the Water Use Act was capable of adjudicating reserved water rights, the Court first noted that the Legislature had enacted provisions governing reserved rights differently than state water rights. While the Act required a water right decree to state the place and means of diversion, § 85-2-234(5)(g), MCA, the Act had been revised to read that a decree "shall state . . . the

43

place and means of diversion, *if any* . . ." for reserved rights. Section 85-2-234(6)(g), MCA. Likewise, provisions requiring a decree to describe the property to which the right was appurtenant, and the use to which water was being applied, were not required for reserved rights, contrasting the fundamental nature of these requirements for state water rights. Given these changes, the Court found the Act broad enough to adjudicate reserved rights, even though it noted that some provisions of the Act were irreconcilable with reserved rights, cautioning the Water Court "to not apply these code sections in an improper manner," or otherwise inconsistently with federal law. *Greely*, 219 Mont. at 94, 712 P.2d at 765.

¶76    The Court begins its misapplication of *Greely* at ¶ 33:

> In effect, the [*Greely*] Court, in determining what constitutes an "existing use," incorporated the Water Use Act's broad definition of "beneficial use" thereby making that definition applicable to both post and pre-1973 water right claims. Using the same statutory definition for "beneficial use" as cited in *Greely* (a definition applicable to all water uses, not just tribes), there is no reason why the Water Court cannot adjudicate both tribal and non-tribal claims for instream uses prior to 1973.

From here, the Court then concludes that *Greely* can be cited as supporting Montana's recognition of pre-1973 instream water rights. It is doubtful that anyone honestly reading *Greely* would give it such an interpretation. None of the many parties and *amici* before this Court cited it for such–and for good reasons. First, *Greely* addressed reserved rights only –state water rights were not before the Court. Secondly, the fact that the Act authorized the Water Court to adjudicate pre-1973 instream *tribal* water rights did not magically create and recognize pre-1973 instream *state* water rights. To the contrary, the *Greely* Court took great

44

pains to differentiate these fundamentally different rights. The majority's interpretation of *Greely* is utterly untenable.

¶77 Yet, from *Greely* and the three other cited cases, the Court finds at ¶ 34 that there is "confusion in our precedent" over the diversion requirement, and that it must "resolve the confusion in favor of the *Axtell, Donich, Montana Coalition* and *Greely* line of authority."[3] This means, according to the Court, that "because Montana has validated non-diversionary appropriations, we now hold that Montana law, prior to 1973 did not absolutely require a diversion for a valid appropriation of water." The absoluteness of the Court's error on the substance of the law cannot be overstated. There is as much "confusion" in our pre-1973 law on diversion as there is in a brick. Our law is simply monolithic.

¶78 This is acknowledged and explained in the brief of the DFWP, who is the *Petitioner* here:

> [T]he general appropriation requirements of pre-July 1, 1973 Montana law. . .[required] an actual diversion (capture) and beneficial use of water to establish intent and to give other water users notice of the specifics of the appropriation. Diverting or capturing water for fish, wildlife or recreation is a beneficial use of water and establishes a valid right under pre-July 1, 1973 Montana law. Instream or inlake fish, wildlife and recreation claims that do

---

[3]This "line of authority" is most interesting. The four referenced cases address very different issues, and none of them cite to any of the others. If the focus is diversion, then *Donich* and *Axtell* spoke approvingly of capture as a form of diversion, *Montana Coalition* acknowledged the superiority of diversion-based irrigation rights over the public's right to use water pursuant to the Public Trust Doctrine, and *Greely* spoke of diversion approvingly in distinguishing state water rights from reserved rights. To the extent these cases provide any authority on the question here, it weighs against the Court's position.

not involve a diversion (capture) of water, except for Murphy Rights, as invalid under pre-July 1, 1973 Montana law.

¶79 The Court has now re-created pre-1973 water law in Montana. Its opinion is a smoothly written, seamless essay which attracts an unsuspecting reader to the conclusion that the holding is completely correct and justified under the law. Indeed, I cannot disagree with the proposition that "[c]ommon sense rebels against a rigid diversion requirement which would refuse to recognize an acknowledged beneficial use simply because application to the use does not require removal from the water source." If this issue had been presented to the Court as a prospective revision to the common law properly arising out of litigation, I would most seriously consider it. However, the issue of instream rights is not even before the Court; only diversion-based claims are before us. The Court chooses to go outside the issues actually raised here, outside the arguments presented, outside the relief requested, and outside 100 plus years of precedent to retroactively redefine pre-1973 law. I submit that the Court is also going outside its judicial obligation to apply the law that is, electing instead to remake pre-1973 law in accordance with what it wished the law had been.

_____
                                 Justice

Chief Justice Karla M. Gray:

I concur in the foregoing concurring and dissenting opinion of Justice Rice.

_____
                              Chief Justice