No. 02-347

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 91N

PHILIP MILANOVICH,

   Plaintiff, Appellant, and Counterdefendant,

 v.

JOHN DWYER,

   Defendant, Respondent, and Counterclaimant.


APPEAL FROM: District Court of the Second Judicial District,
       In and for the County of Silver Bow, Cause No. DV-01-18
       The Honorable Loren Tucker, Judge presiding.


COUNSEL OF RECORD:

   For Appellant:

      Jonathan R. Motl, Reynolds Motl Sherwood, Helena, Montana

   For Respondent:

      Dolphy O. Pohlman and Timothy M. Dick, Corette Pohlman & Kebe, Butte,
      Montana


         Submitted on Briefs: March 6, 2003

            Decided: April 13, 2004

Filed:


        _____
              Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2    Dr. Philip Milanovich (Milanovich) appeals the judgment of the Second Judicial District Court, Silver Bow County, concluding that Dr. William F. O'Brien (O'Brien) abandoned his property and that O'Brien's former landlord, John H. Dwyer (Dwyer), asserted ownership over that property prior to that property being claimed by its true owner.

¶3    We address the following issues on appeal and affirm:

¶4    1.    Was the District Court's conclusion that O'Brien had abandoned his property supported by substantial evidence?

¶5    2.    Did the District Court err in concluding that Dwyer had asserted ownership over the property prior to that property being claimed by its true owner?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶6    O'Brien, a practicing dentist for 35 years, worked in various cities, the last of which was Townsend, Montana. Having lived before in Butte, Montana, O'Brien wished to return to Butte to open a dental practice there.

¶7    O'Brien looked at commercial property for rent in Butte and viewed a free-standing space that Dwyer had available to lease. This free-standing space previously had been a

2

carpet showroom, and, therefore, was an open space without interior divider walls.

¶8	After viewing this commercial property, O'Brien rented the space from Dwyer for approximately six weeks before signing a lease agreement with Dwyer. On October 30, 1999, O'Brien then entered into a lease agreement with Dwyer. This lease agreement stated that O'Brien, the tenant, agreed to pay Dwyer, the landlord, $1,600 per month for rent. Rent was due on or before the first day of each month.

¶9	Before seeing dental patients, O'Brien performed extensive remodeling on the rented commercial space, transforming the space from its previous carpet showroom to a functional dental office. O'Brien took out a loan from Citicorp in order to fund the transformation of this rented commercial space. Hence, Citicorp had a security interest, which it did not perfect, in the dental property that O'Brien purchased with the money Citicorp lent to him.

¶10	Dwyer greatly assisted O'Brien's endeavor in transforming the open space to a functional dental office, spending in total around $44,000 in construction costs.

¶11	O'Brien saw his first patient in April 2000 and continued to see patients until August 2000, when he traveled to Louisiana for an evaluation. O'Brien had been experiencing various personal difficulties which prompted his trip to Louisiana. This trip, however, created a financial hardship. O'Brien notified his creditors that he would have difficulty in meeting his financial obligations.

¶12	As a result of this financial hardship, O'Brien was late in paying the August 2000 rent and did not pay the September 2000 rent that was due on the first of the month. O'Brien also defaulted on his payment obligations to Citicorp.

¶13 As a result of O'Brien's delinquent September 2000 rent payment, Dwyer told O'Brien that he was going to change the locks to the office. Dwyer gave O'Brien 24 hours to remove his personal effects. O'Brien did so, removing his diplomas, some plants, chairs, tables, and a microwave. The office space then was vacant.

¶14 On October 9, 2000, Milanovich, also an established dentist in Butte, met with Dwyer. Milanovich was very interested in renting O'Brien's former dental office. Milanovich toured the office space and had his staff do the same. Milanovich then gave Dwyer a check for $1300, which Dwyer cashed.

¶15 Milanovich testified that he believed he had successfully rented the office space from Dwyer, since Dwyer cashed Milanovich's check. Dwyer, however, testified that he did not consider Milanovich a tenant, as the rent for the office space was $1,600 per month, although Dwyer could not explain the reasoning behind why he cashed Milanovich's check.

¶16 After O'Brien vacated the office space upon Dwyer's request, Dwyer sought legal counsel regarding the money O'Brien owed him in recoupment of delinquent rent and remodeling costs.

¶17 After Dwyer retained legal counsel, on November 10, 2000, O'Brien was served, via certified mail, with a notice of abandonment and termination regarding his leased property. On November 28, 2000, O'Brien was again served via certified mail, this time with a notice of plan to sell his leased property. O'Brien did not respond to either of these notices, nor did he file any action to assert ownership of the property.

¶18 In the meantime, Milanovich met with O'Brien informally, as they were long-time

4

friends. During this meeting, O'Brien told Milanovich that he would sell to Milanovich the dental property remaining in O'Brien's former office space for $10,000. Milanovich accepted O'Brien's offer, and on December 12, 2000, Milanovich and O'Brien entered into a bill of sale agreement that reflected their previous discussions. Milanovich gave Dwyer a copy of the bill of sale agreement on December 13, 2000.

¶19    Dwyer then met with Milanovich on December 14, 2000. At this meeting, Dwyer returned to Milanovich the $1,300 that Dwyer had previously accepted. Dwyer told Milanovich that he, and not O'Brien, owned the dental property remaining in O'Brien's former office space. Dwyer then removed the dental property remaining in O'Brien's former office space. Dwyer placed this dental property in his storage room and proceeded to rent out the vacant office space to another tenant.

¶20    In January 2001, Milanovich filed a claim against Dwyer for possession of the property he purchased from O'Brien. After a bench trial, the District Court concluded that O'Brien had abandoned his property and that Milanovich had no interest in the property. The District Court dismissed with prejudice both Milanovich's claims and Dwyer's counterclaims.

¶21    Milanovich now appeals the District Court's judgment.

5

**STANDARD OF REVIEW**

¶22    We review a district court's findings of fact to determine whether they are clearly erroneous. *Galassi v. Lincoln County Bd. of Com'rs*, 2003 MT 319, ¶ 7, 318 Mont. 288, ¶ 7, 80 P.3d 84, ¶ 7. In making this determination, we utilize a three part test, wherein we review (1) whether the findings are supported by substantial evidence; (2) whether the effect of the evidence was misapprehended; or (3) whether a mistake was committed. *Galassi*, ¶ 7. We review a district court's conclusions of law to determine whether they are correct. *Galassi*, ¶ 7.

**DISCUSSION**

¶23    **1.    Was the District Court's conclusion that O'Brien had abandoned his property supported by substantial evidence?**

¶24    Milanovich argues that because Dwyer admitted that "at no time" did O'Brien ever tell Dwyer that O'Brien had abandoned his property, the District Court needed to analyze O'Brien's actions to infer O'Brien's intent to abandon. And, this inference, Milanovich maintains, was not that O'Brien intended to abandon his property. Rather, Milanovich argues: (1) that no substantial evidence existed to prove that O'Brien even received the notice of abandonment or the notice of sale; (2) that O'Brien met with Milanovich less than three months after Dwyer changed the locks on O'Brien's property, thereby asserting ownership of the property; (3) that Dwyer threatened Milanovich, thereby implicitly asserting that Dwyer did not have rights to the property; and (4) that O'Brien did not voluntarily relinquish his property since he attempted to bring a criminal action against

6

Dwyer, but was turned away.

¶25   Dwyer argues that because abandonment is "the absolute relinquishment of a known right," O'Brien's intent to abandon is "the first and paramount object of inquiry." As such, Dwyer argues that substantial evidence existed to prove that O'Brien abandoned his property, namely: (1) that he moved out of the leased office space; (2) that he was in default of several financing agreements secured by the property, and, therefore, if he had retained ownership, the property would have been seized by the secured party; (3) that he gave up all means of access to the building and made no attempt to retrieve property through a court action; (4) that he never requested or demanded permission to retrieve the property; (5) that he ignored notices that were delivered via certified mail and were addressed to the address O'Brien listed on his lease with Dwyer; and (6) that by the time he contacted and entered into an agreement with Milanovich, he did not have an interest in the property he tried to sell.

¶26   We conclude that Dwyer's arguments are correct.

¶27   Abandonment is the "concurrence of act and intent," wherein the act is "the relinquishment of possession and the intent is a manifestation not to resume beneficial use of [the property]." *Shammel v. Vogl* (1964), 144 Mont. 354, 359, 396 P.2d 103, 106. Neither act nor intent alone is sufficient to establish abandonment. *Shammel*, 144 Mont. at 359, 396 P.2d at 106. If no express intent exists, intent not to resume beneficial use may be inferred by the acts of the owner. *Hawkins v. Mahoney*, 1999 MT 296, ¶ 16, 297 Mont. 98, ¶ 16, 990 P.2d 776, ¶ 16.

7

¶28  In *Rieman v. Anderson* (1997), 282 Mont. 139, 935 P.2d 1122, abandonment existed where the owner "plugged" the diversion to his side of the ditch, plowed in his ditches, and made statements that he no longer intended to irrigate. *Rieman*, 282 Mont. at 146, 935 P.2d at 1126. In *Hawkins*, however, abandonment did not exist where the prisoner, upon his return to prison and before anyone claimed his belongings, requested return of his property and where the prison labeled his property with the prisoner's name and selectively returned it to him. *Hawkins*, ¶¶ 17, 19.

¶29  Like the facts presented here, the issue in *Whalen v. Taylor* (1996), 278 Mont. 293, 925 P.2d 462, concerned whether the tenant abandoned his apartment. We held that nothing in the evidence indicated "absolute relinquishment" because (1) the tenant kept his belongings in the apartment; (2) the tenant contacted his landlord as to his delinquent rent and requested more time to pay; and (3) the tenant ultimately tendered the late rent payment, albeit on the same day the landlord changed the locks. *Whalen*, 278 Mont. at 300, 925 P.2d at 466. In so holding, we discussed another abandonment case, namely *Napier v. Adkison* (1984), 209 Mont. 163, 678 P.2d 1143, wherein we held that the tenants there showed an intent to abandon (1) by not making rental payments on time; (2) by never being at the apartment; and (3) by leaving their dogs unattended on the premises. *Napier*, 209 Mont. at 167, 678 P.2d at 1145.

¶30  Here, O'Brien made no express statements that he intended to abandon his property, as did the individual in *Rieman*. However, unlike the prisoner in *Hawkins*, O'Brien did not attempt to reclaim his property, although he knew a sale of the property was pending. In

8

addition, unlike the tenant in *Whalen*, O'Brien took from his office his personal belongings; he did not request of Dwyer additional time to pay his September rent; nor did O'Brien pay the September rent due, as did the tenant in *Whalen*. Rather, much like the tenant in *Napier*, O'Brien defaulted on his rental obligation to Dwyer as well as his payment obligation to Citicorp; he gave up all means of access to the property; and he neither attempted to return to the property nor requested to retrieve additional belongings from the property. Further, he did not respond to either the notice of abandonment and termination or the notice of sale served upon him. We conclude that O'Brien's actions demonstrate that he intended to relinquish his interest to the property.

¶31 Therefore, we hold that substantial evidence supported the District Court's conclusion that O'Brien abandoned his property.

¶32 **2. Did the District Court err in concluding that Dwyer had asserted ownership over the property prior to that property being claimed by its true owner?**

¶33 Milanovich argues that O'Brien did not abandon the property. But, alternatively, if O'Brien did abandon the property, Milanovich argues that the District Court still erred because when Dwyer accepted Milanovich's rental check, Milanovich, "as the true property owner, removed any stigma of abandonment." Milanovich claims that because he paid money for the property, he is, in fact, the true owner under this Court's holding in *Hawkins*. In addition, Milanovich argues that Dwyer only took possession of the property with the intent to sell it in order to collect remodel costs and not to claim ownership over the property. Hence, Milanovich maintains that Dwyer only claimed the right to possess the

9

property, the right to sell the property, and the right to keep some of the proceeds from the sale of the property. Dwyer did not, according to Milanovich, claim ownership over the property.

¶34 Dwyer argues that because O'Brien abandoned the property, O'Brien had nothing to assign to Milanovich. However, in the alternative, should this Court hold that O'Brien was able to transfer his rights in the property, Dwyer argues that Milanovich still has not proven any damages. Specifically, Dwyer maintains that O'Brien was prohibited from assigning his rights to the property because of Citicorp's security agreement, and, therefore, Milanovich, as an assignee, took the property subject to that security interest--a fact which Milanovich does not dispute. Further, Dwyer argues that under this Court's holding in *Ragen v. Weston* (1981), 191 Mont. 546, 625 P.2d 557, O'Brien made no effort to remove his equipment during the term of his lease and, therefore, lost his right to remove any fixtures.

¶35 Because we hold that the District Court did not err in concluding that O'Brien abandoned his property, Dwyer, and not O'Brien, had possession of the property at the time O'Brien met with Milanovich and entered into a bill of sale agreement. Hence, O'Brien had no interest to sell to Milanovich and the District Court did not err in concluding that "Milanovich could not acquire from O'Brien property which O'Brien no longer owned."

¶36 Affirmed.

/S/ JAMES C. NELSON

10

We Concur:

/S/ PATRICIA O. COTTER

/S/ JIM REGNIER

/S/ JIM RICE

Justice W. William Leaphart dissenting.

¶37    I dissent. In determining whether there has been an abandonment of property, intention is the first and paramount object of inquiry. *Conway v. Fabian* (1939), 108 Mont. 287, 306, 89 P.2d 1022, 1029. There was no proof that O'Brien intended to abandon property worth over $200,000. Although noting a lack of proof that O'Brien received either of the two notices, the District Court concluded that he "ignored" the notices. He cannot be said to have "ignored" notices which he may not have received.

¶38    The District Court found that O'Brien took no steps to assert ownership. This finding is contrary to the evidence that, less than three months after being locked out on September 15, O'Brien attempted to file a criminal complaint, he called Dwyer to protest his possession of the property and then, seven days later on December 12, 2000, he sold the property to Milanovich. These were all steps to assert ownership.

¶39    In this case, the District Court presumed abandonment based upon O'Brien's acts or failures to act. A presumption or inference of intent to abandon one's property, based solely on the acts of the owner, is a rebuttable presumption. *Hawkins v. Mahoney*, 1999 MT 296, ¶ 18, 297 Mont. 98, ¶ 18, 990 P.2d 776, ¶ 18. Here, any presumption of abandonment was rebutted when O'Brien sold to Milanovich, who, in turn, made requests for his property before it was claimed by anyone else.

¶40    Finally, Dwyer did not claim ownership of the property. Rather, he took possession with intent to sell some of the property to collect a self-determined amount of remodeling

12

costs. The November 10 notice stated that O'Brien had fifteen days "to pay all outstanding rents and remove your property." The notice refers to removing "your [O'Brien's] property." Likewise, the November 28 notice states that "[y]ou can get the property back at any time before it is sold by paying the full amount you owe . . . ." Obviously, if Dwyer were asserting ownership, he would be not offering O'Brien the opportunity to take his property back. Dwyer was merely taking the position of a landlord in possession, claiming the right to sell pursuant to § 70-24-430, MCA.

¶41    I would reverse.


                                        /S/ W. WILLIAM LEAPHART


Chief Justice Karla M. Gray concurs in the dissent of Justice Leaphart.

                                        /S/ KARLA M. GRAY


13